*Exhibit A*

STATE OF NEW YORK
COUNTY OF ERIE
ERIE COUNTY COURT

---

PEOPLE OF THE STATE OF NEW YORK

v.

DECISION & ORDER
INDICTMENT # 2004-2630

JOSUE ORTIZ

**DEFENDANT**

---

APPEARANCES:

Donna A. Milling, ADA
Chief, Appeals Bureau
Erie County District Attorney's Office
25 Delaware Avenue
Buffalo, NY 14202

For the People

John R. Nuchereno, Esq.
2503 Niagara Street
Buffalo, NY 14202

For the Defendant

---

The defendant brings this motion pursuant to CPL 440.10 1 (g), (g-1) and (h) for an order vacating his conviction entered upon his guilty plea on March 22, 2006 to two counts of Manslaughter 1st degree (PL 125.20 [1]) for which he was sentenced on June 16, 2006 to concurrent determinate terms of imprisonment of 25 years followed by five years of post release supervision (PRS).

He bases his motion upon claims of: 1) newly discovered evidence consisting of sworn testimony of witnesses in a Federal Grand Jury in 2011 and 2012 establishing that four

-1-

individuals other than himself (Brandon Jonas, Efrain "Cheko" Hidalgo, Frank "Macho" Matias and Misael "Misa" Montabo) were responsible for the homicides for which he pled guilty, 2) DNA evidence which excludes him from the crime scene as well as from items of evidence found at or near the scene, and 3) actual innocence. He contends that his guilty plea was based upon a false and erroneous confession given to the Buffalo Police at a time when he was suffering from a severe psychotic break from reality, exacerbated by sleep deprivation, drug use and a limited command of the English language.

The People oppose the defendant's motion arguing first that CPL 440.10 (g) provides no avenue for relief where, as here, the judgment derives from a guilty plea rather than a guilty verdict (People v. Sides 242 AD 2d 750 [3rd dept. 1997]). They also contend that the so-called new evidence, consisting, in their view, of inconsistent if not incredible testimony from a curious collection of criminals, immunized witnesses and other deal seekers: 1) would not change the result, 2) could have been discovered with due diligence (since he supposedly knew his co-defendants), 3) is not material in view of his sworn on-the-record admission of guilt both at the time of his guilty plea and in the Federal Grand Jury on July 21, 2011 (CPL 440.30 [4] [a]), 4) is cumulative and 5) merely contradictory of former evidence. (People v. Salemi 309 NY 208 [1955], People v. Tankleff 49 AD 3d 160 [2nd dept. 2007]).

The People argue that the DNA evidence (i.e. the absence of the defendant's DNA from the crime scene and certain items of physical evidence including a chain removed from one of the victim's neck and a baseball bat reportedly handled by two of the perpetrators) not only fails to create a substantial probability of innocence (CPL 440.10 [g-1]), but casts doubt on the testimony of one of the key witnesses (Frank Matias) who purports to exonerate him by exclusion. (Matias,

an immunized witness, testified in the Federal Grand Jury that Cheko Hidalgo who was wearing gloves, handed him the bat before kicking in the door to the victim's house. Matias' DNA was not found in the swabbing from the bat).

The People also contend that any claim of actual innocence is belied by the defendant's detailed and specific confession to the police, his sworn guilty plea, initial Federal Grand Jury testimony and other acknowledgments of culpability to both a jail house informant and psychiatric staff.

## The Victims and the Homicides

Nelson "Lobo" Camacho and his brother Miguel "Flaco" Camacho were West side drug dealers who resided in the first floor apartment at 879 Niagara Street near Massachusetts Avenue in Buffalo. On November 11, 2004 shortly after 9:30 p.m., three men kicked in their front door and stormed into the dwelling. Upon encountering Lobo in the front hallway, one of the intruders shot him in his upper left back (with an AK-47 automatic rifle) nearly severing his left arm from his body. The shooter removed a gold chain from his neck and dropped it to the floor.

As Lobo lay there bleeding, the other two intruders, one of whom was wielding a bat, encountered Flaco in a back room pointing a chrome .25 caliber handgun. They called out to the gunman who joined them and then fired multiple shots into Flaco's chest and abdomen which propelled him into the wall and then onto the floor where he fell into a crumpled, dying heap.

After unsuccessfully searching the premises for a large stash of drugs and money that they had been led to believe would be there for the taking, the intruders fled through the front door one after the other. As he exited (and realizing that they had gone there for nothing), the shooter fired a killing shot into the right side of Nelson Camacho's face. The bullet exited the top of his

head and apparently burrowed through the floor into the basement.

Luis "Canario" Camacho was home with his girlfriend, Yvette Moldonado when he received a phone call from his brother Miguel who asked him to come over because something had happened to Nelson who was down. Upon arriving at the scene in his vehicle at Niagara, Luis observed two guys (described as pretty skinny, not big, and wearing hoodies, one possibly yellow), running very fast from the house across the street and heading toward Massachusetts. Luis went into the house and observed his brother Nelson (whom he identified from his ring), laying on the floor with his face nearly blown off. He proceeded to the back and found Miguel, barely breathing and holding a gun. Luis called 911. Shortly thereafter, the police arrived, ordered Luis to drop the gun and took him to the ground.

Pertinent entries in the BPD complaint log reveal the following: 9:46 p.m. - "Two brothers are shot." 9:51 p.m. - "3 PM's, 2 in black hoodies, 1 in gray...all 3 running on 7th." 9:54 p.m. - "AK 47 used in the shooting." 9:58 p.m. - "3 men took off, also had a bat, dropped bat, man showed police where it is." 10:07 p.m. - "3 males were skinny, one was wearing yellow shirt, headed to Niagara."

The Buffalo Police Investigation

Detective Mary Gugliuzza (BPD Major Crimes Unit [MCU]) was called to the scene at 10:00 p.m. Upon arrival, she met with other detectives and officers who were already there. In her report of November 11, 2004, she noted that the front door and frame showed signs of damage consistent with a forcible entry. She observed a broken gold chain on the dining room floor and noticed that the television was turned on in the living room. She saw apparent brain matter on a couch and the carpet and observed the body of a deceased male (Nelson Camacho),

-4-

wearing a white t-shirt, blue shorts, white socks and no shoes. He had obvious gun shot wounds to his face and left bicep. She also saw the small caliber, nickel plated handgun. A large caliber bullet casing was observed to the right of the victim's leg. A bullet hole leading to the basement was also found in the floor.

A bullet hole was also observed in the wooden door of the back hallway. A large caliber casing was on the floor. A bullet was removed from the bedroom door frame. Brain matter appeared on the floor, ceiling and window of the bedroom. A pool of blood, loose slacks, several $20 bills and red stained shoe prints were observed in the bedroom. The body of the second victim (Miguel Camacho) was observed in a white t-shirt and boxer shorts, lying on his side against the door. Bullet gouge marks were observed in the kitchen wall. Blood spatters and shoe prints were seen on the kitchen floor.

The detective also observed six bullet holes in the rear metal door leading to the backyard. A second television was turned on in an adjacent rear bedroom. Splintered wood from the door was found on the bed along with a holster, a cell phone, pills and drug paraphernalia, including baggies, a scale and a spoon with residue. Bullets and bullet fragments were found in a rear hallway. Another officer (Schulz) reported observing red shoe prints and holes in the rear door as he approached from the outside.

As part of her investigation, Detective Gugliuzza also interviewed Beverly Laborgne, the resident of the upper apartment. She also spoke to Jeilyn Rosario (Nelson Camacho's girlfriend) who, when asked if anyone wanted to kill Nelson and Miguel, replied "Misael Montalbo." She explained that Montalbo had come on to her about a month earlier and threatened to kill Nelson. She stated that he lived on Hudson Street and drove a yellow car.

Detective Richard Wagstaff (BPD/MCU) arrived at 879 Niagara and was advised by Detective James Lonergan that there may be relevant evidence in the yard at 53 Massachusetts. He went there and observed a blue baseball bat. He interviewed one Steven Acevedo of that address who said that he had seen three guys (two in dark hoodies and one in a gray hoodie) with something in their hand.

A Carmelo Mercado of 97 Rhode Island stated that he was standing outside the store at Massachusetts and Niagara when he saw three Spanish looking dudes (two in black or dark blue hoodies and one in a gray hoodie). The one in the gray hoodie (with jeans) was coming out of the walkway next to 53 Massachusetts. He described these individuals as being about 5'5" to 6" tall and of medium build. He said that they ran down Massachusetts to Seventh Street toward Rhode Island.

### Evidence at the Scene

Detective James Maroney documented the scene and collected evidence. Some of the many items observed included a gold chain on the living room floor near Nelson Camacho's body, two cartridge casings (consistent with an AK-47) at his feet, a cell phone on the living room floor, a .25 caliber handgun on the living room floor, two cartridge casings (consistent with an AK-47) in the hallway between the living room and kitchen, cartridge case (consistent with an AK-47 on the kitchen floor, splintered frame from the door frame of the rear bedroom, cell phone in the rear bedroom, drug paraphernalia in the rear bedroom, lottery ticket in the front bedroom, bloody shoe prints on an envelope and a bank envelope in first bedroom, cartridge case (consistent with an AK-47) on the hallway floor, multiple blood stained shoe prints on the kitchen floor, apparent blood stains in the rear hall, three deformed rifle bullets in back hall, a

deformed bullet from the doorway of the first bedroom, keys and several drawing numbers found in a leather jacket on the living room couch, $2,320.00 in cash and personal papers of Nelson Camacho in grey jeans found in the first bedroom, Nelson Camacho's bloody clothing (white t-shirt, blue/grey gym shorts, blue/white boxers, white socks), Miguel Camacho's bloody clothing (white t-shirt, blue jeans, orange gym shorts, blue/white boxers, white socks), two cartridge casings (consistent with AK-47) on living room floor (during secondary search), three .9 mm cartridges in watch pocket of jeans found on the floor of the first bedroom. The police also retrieved a driver's license of one Kadeejah Kirk along the curb outside 879 Niagara.

## Ballistics Report

A CPS Laboratory ballistics report (dated 1/19/05) indicated that eight cartridge cases retrieved from the scene, all of Russian make, were consistent in their rifling characteristics with an SKS and AK style rifles. Submitted bullets and bullet jacket fragments were also consistent with these rifles. The Raven P-25 semi-automatic pistol which contained four cartridges in the magazine was found to be operable.

## DNA Reports

CPS Laboratory reports dated May 25, 2012, December 14, 2012 and June 17, 2013 regarding DNA analysis of swabbings taken from the handle and barrel of the bat indicated the Nelson Camacho was the source of the major DNA profile (with additional DNA activity from at least three individuals), and that Miguel Camacho could not be excluded as a possible source of the minor DNA profile. Luis Camacho, Uda Hidalgo, Brandon Jonas, Frank Matias, Efrain Hidalgo and the defendant were all excluded as possible sources of DNA.

A swabbing of the necklace found at the scene yielded no DNA profile.

-7-

A driver's license whose connection to the case is unknown (perhaps the one found at the curb), revealed DNA from three unknown individuals. (All of the above-named individuals were excluded). The defendant's DNA was found on his own clothing (shirt and sweater).

### Jeilyn Rosario

In a sworn statement given to police on November 11, 2004, Jeilyn Rosario indicated that she went over to 879 Niagara at around 10:00 p.m. with her sister-in-law's baby when she saw the police on the scene and learned from "Cucado" who was on the stairs crying that Nelson and Miguel had been killed. She denied that they sold drugs. She mentioned that Misael Montalbo may have wanted to harm them over an argument that they had at a barbershop on West Ferry over Montalbo's previous advances upon her. She described Montalbo as being 5'4" tall, 200 lbs. and residing at 35 Hudson.

### The Autopsies

On the morning of November 12, 2004, Detective Timothy Salamone attended the autopsies of Nelson and Miguel Camacho. He observed the entrance wound on Nelson's right cheek with exit hole at the top of his head and a bullet wound in the area of his left arm from the armpit to his forearm. Miguel had four entrance wounds on various locations on his chest with corresponding exit wounds on his back.

### Luis Camacho

Later that day, Detectives Michael Mordino and Michael Acquino interviewed Luis Camacho who recounted the call from Miguel the night before. Although Miguel asked him to come armed (a fact not mentioned to Detective Wagstaff), he did not do so because he did not own a gun. He said that he and his brothers used drugs but did not sell them. (Luis was

-8-

questioned further by Detective Michael Root that evening).  He said he had not brought the .25 caliber gun to the scene.

At 7:20 p.m. on November 12, 2004, Detective Joseph Cook received an anonymous tip from a female caller who reportedly had heard on the street that the three individuals responsible for the shooting were "Brandon," "Cheko," and "Macho."  The caller thought that Brandon may live on Helen Street and had heard that the shooting was over a large quantity of money.

<u>Frank Coppola</u>

In a sworn statement given to police in the early morning hours of November 12, 2004, Frank V. Coppola said that he was leaving his house at 886 Niagara to go to Zip's store at Niagara and Massachusetts when he heard a "pop."  He went into the store, bought cigarettes and was walking back home, southbound on Niagara, when he saw three males, "wearing dark hoodies, all about six feet tall," run by him on the sidewalk heading north and then turn west on Massachusetts.  As they ran by, he saw one of them throw something in the yard next door to his house and heard a "klunk."  He went there and found a metal baseball bat which he later pointed out to the police.

<u>Pedro Vega</u>

The following day, the police took a statement from Pedro Ramos Vega aka "Cano" of 76 Barton Street.  On the night of November 11, 2004, he was fixing a car at Zip's on Niagara after which he went to the Pizza Shop.  When he got there, he observed three guys standing across the street in front of a vacant store.  At he exited, Vega now observed them walking towards Zip's. They then went on to the porch of an abandoned house and were pacing and looking across the street.  They headed toward Zip's and crossed the street.  At that point, Vega noticed that one of

them was carrying what appeared to be a big gun. They walked toward the corner of Niagara and Massachusetts and went into a house just before the antique store.

Vega noticed one of the individuals run out of the house, looking up and down Niagara. He then went back inside. Vega then heard what sounded like a loud shot. He and his friend, Carlos then went inside Carlos' house. He later heard the sound of a woman screaming and crying.

Vega described the three suspects as young looking and light skinned, wearing dark colored hoodies and jeans. He described the one with the gun as the tallest of the three (i.e. "at lease 5' 11"). The other two were "around 5' 8."

<u>Carlos Osario</u>

Carlos Osario told police in his sworn statement of November 13, 2004 that he was on his porch with Cano when he saw the three men standing on the porch of the abandoned house across the street. They then crossed the street toward Zip's. Osario observed "the Puerto Rican male with the black hoodie" carrying a long barreled rifle under his hoodie. All three of them went up the stairs "where the two brothers live" and "one of the black males with a grey hoodie knocked on the door." Osario then heard a loud bang on the door. About three minutes later, after hearing gunshots, he saw "two people, one with a grey hoodie and one with a black hoodie ...run back across the street and go through the back kitchen window of the corner house" (where Tebo lives). He did not see the third guy but later did see "two light skinned Puerto Rican females whom he recognized from the neighborhood with blonde hair and a young male child coming out screaming." The police arrived five minutes later.

Osario described all three suspects as "short,...very young." The other "B/M had a g(r)ey

-10-

hoodie," and had "thick eyebrows and a wide nose and big lips." The PR/M had on a black

hoodie and black pants" and appeared "brown skinned (with) trimmed eyebrows." He said that

he had previously seen the Puerto Rican male at a barbershop on Niagara Street and on Tenth

Street. He also saw him and one of the black males earlier in the day "arguing with the brothers

in front of Zip's." The one with the corn rows had also been on his porch before. He said that

this individual lives next to the pizzeria.

About ten minutes after the shooting, Osario saw Tebo (Esteban Acevedo) ride up to the

scene on his bicycle. He described him as a tall, roughly 38 year-old Puerto Rican male with

white hair and light skin.

<u>Misael Montalvo</u>

On November 15, 2004, Detectives Charles Aronica and Philip Torre (with the help of a

Spanish speaking officer) took a sworn statement from Misael Montalvo who came in because

the Camacho family was supposedly blaming him for the murders of Nelson and Miguel which

resulted in threats against him and his family. He explained that the problem started when he had

asked Nelson to return to him the title to a vehicle that belonged to him. Nelson refused to oblige

and threatened to have his brothers jump him. They did not resolve their differences but only

ignored each other thereafter. The last time they had spoken before November 11th was when

they argued over the title in the barbershop.

Montalvo described Jeilyn Rosario as "a real good friend of our family's" and denied ever

trying to kiss her or having words with her. As for his whereabouts on the night of the homicide,

he said that he was at his father-in-law, Segundo Justiniano's house on Niagara Street near Porter

Avenue watching wrestling from 9:00 to 10:00 p.m. with Samuel Ortiz, Montalvo's girlfriend,

Carmen Justiano, her son and Ortiz's daughter. Earlier at 7:00 p.m., he and Sammy Ortiz picked up Sonia Ruiz from work, then picked up her kids on Fargo and dropped them all off at 482 7th Street. From there, at about 8:00 p.m., he went to the "24 hr. store on Niagara and Massachusetts to check out the lottery numbers" after which he went to his father-in-law's place at about 8:15 p.m. He claimed that he left his father-in-law's at about 10:15 p.m. and drove Sammy and his daughter home. He denied any involvement in the Camacho murders.

### Segundo Justiniano

Detectives Mary Gugliuzza and Mark Lauber interviewed Segundo Justiniano who recalled watching wrestling with Montalvo and his girlfriend (Justiniano's daughter) from 9:00 p.m. to 10:00 p.m. on the night in question. At 10:00 p.m., he saw on the news that there had been a shooting at Niagara and Massachusetts. Carmen Justiniano also supported Montalvo's statement regarding his whereabouts when the homicides occurred. She also stated that Montalvo and Nelson Camacho had argued over the automobile title and had not spoken to each other since their fist fight. She also said that one of the Camacho's had threatened to bring the whole family over to assault her and Montalvo replied that he would kill them. She said it was a hollow threat because he was not capable of killing anyone. She also mentioned threats having been made to Montalvo's family in Puerto Rico.

### Enter the Defendant

At around 11:00 a.m. on November 15, 2004, Detectives Lauber and Torre responded to a call from Officer Marie Schreckenberger who advised that the defendant (who reportedly resided at 142 Germain Street) had jumped into her patrol car at Hampshire and 19th Street and reported that unknown people were trying to kill him because they believed that he was involved in the

Camacho brothers' homicides. The defendant, who presented with glassy eyes and admitted to having smoked marijuana, could not articulate where, how or by whom such threats had been made. Deciding that the defendant may be in need of psychiatric help, the officers arranged to have the defendant transported to Buffalo General Hospital (BGH) by ambulance.

Later that afternoon, Detective Mark Vaughn received a call from a staff counselor at the BGH Psychiatric Department advising that the defendant claimed to have information about the double homicide at 879 Niagara Street. He also expressed fear that the killers were after him. Detectives Vaughn, James Lonergan and James Lema went to the hospital and spoke to the defendant with the assistance of a Spanish speaking officer, Edwin Torres.

The defendant identified himself as Josue Ortiz (DOB 10/11/81) of 19 Hoyt Street. He said that he knew the Camacho brothers, claiming that they were members of a cocaine ring headed by Justo and Jose Caranzo who rented an apartment in his name at 142 Germania where he used to live before moving to Hoyt Street. The defendant also said that he was a member of this drug ring.

When asked if he had any direct knowledge of the murders, the defendant said no. He surmised, however, that the Camacho brothers were killed over jealousy about their drug dealing. He said that the person he feared was one Rinaldo Velasquez because he had a shotgun. (He did not suggest, however, that Velasquez had anything to do with the killings).

The detectives described the defendant as being upset throughout the interview. (The BGH Mental Health Assessment report indicates that the defendant said, "I'm scared. People are trying to kill me." He further said that he believes he knows the perpetrators of the double homicide on Niagara Street and claims, "they're after me."). At a Huntley hearing held on

-13-

August 31, 2005, Officer Torres described the defendant as "unsettled, very nervous and jerky." Detective Lonergan described him as "very frightened." The detectives left the defendant, not considering him to be either a suspect or a witness, and advised that he should contact them after his release from the hospital if he had any further information.

The following day, Officer David Sadlocha responded to 911 call of unknown trouble on Grant Street. Upon arrival, he was advised that a young man was seeking help at the Native American Center and had walked away to 142 Germain. Sadlocha proceeded to that address and encountered the defendant who said that he had "something to say about Niagara Street." Sadlocha told the defendant, "say no more," at which point he drove him to the Major Crimes Unit office to speak with detectives.

<u>The Defendant's Confession</u>

Detectives Mark Stambach and James Lonergan interviewed the defendant, with Officer Torres interpreting, beginning at 7:30 p.m. This time, the defendant claimed involvement in the homicides. After being advised of the Miranda warnings and signing the rights card at 8:30 p.m., the defendant gave a formal statement commencing at 9:00 p.m. It was typed out, read to him and signed by him at 10:30 p.m.

After stating that he'd dropped out of the eleventh grade in Puerto Rico and had been living in Buffalo for about five months, the defendant was informed by the detectives that they were "investigating the shooting death of... Miguel Camacho and...Nelson Camacho...(who) were victims of a homicide...on 11-11-04...at about 9:44 p.m. at 879 Niagara Street." When asked to relate his knowledge of the homicides the defendant said, "...about 9:30 p.m.,...we...(meaning) (m)e, Udah and Udah's brother...got there and did what we did. (We)...got in...(b)ecause we

-14-

heard that they were making money. We went over there to assault them only. He opened the

door. I mean I did. Udah kicked the door in. We entered (and)...got in. All three of us

entered...and BAM. Fired shots. Forced our way in and fired a shot. Then we heard the other

brother yell out, (")they are killing my brother.(") They jumped on Floco. Udah's brother fired

the nine millimeter. No, the rifle I mean. Shot fired at Floco. Floco came and Udah's brother

came and Pow. They (sic) we run (sic) off."

In reply to whether he went there for drugs or money, the defendant said, "both." He also

He further answered that they entered through the front door and again said, "(w)e kicked

in the door, I did." He said they all had weapons (he brought a shotgun), and Lobo was the first

person that he saw. He also said that he struggled with Lobo and when asked, "(d)id anyone try

to take anything from Lobo," he said, "(y)es I did, his chain." He said that he also saw "El-

Flaco" standing in the rear of the apartment with a gun in one hand and a cell phone in the other.

He was saying on the phone, "they are killing Lobo." When asked if he'd seen a television (big

or small, on or off), he replied that it was big and turned on.

In reply to whether he went there for drugs or money, the defendant said, "both." He also

said that he saw money and drugs there. When questioned further about guns, the defendant

stated that Udah's brother brought the AK and was firing it in the house. Then when asked,

"(d)id you have the AK-47," the defendant said, "(y)es I did." He was then asked, "(d)id you do

the shooting," he said, "(y)es" and when specifically asked, "(d)id you shoot El-Flaco with the

AK," he said, "yes." When asked where he shot him, he said, "(i)n the belly." As to Lobo, he

replied that he shot him in the "(f)ace, chest, I did a couple when he was on the floor." (Lobo did

not have any weapon when they entered the house). Earlier in the statement, when asked how

many shots were fired in the house he said, "(a) couple. It was rapid and real fast." He also said

-15-

that they brought three types of guns in the house including a shotgun, pistol and an AK. The defendant said that they didn't take anything from the apartment because they were scared. When asked why he first said he had a shotgun instead of the AK 47, the defendant replied that he did so because he was scared. (The defendant's motion to suppress statements was denied on November 1, 2005).

## Felony Complaint

The defendant was charged with two counts of Murder 2nd degree. The booking form lists him a 6' 3" tall and 280 lbs. (Other records list him as tall as 6' 5" or 6' 6" tall and 330 lbs.). At 12:30 a.m. on November 17, 2004, detectives seized a carving knife, cell phone, clothing (size 42 jeans, plaid shirt XL, size 13 black sneakers, white socks), a wallet with personal papers and three cents from the defendant. He gave the police permission to search 142 Germain where they seized two pairs of size 13 white sneakers, one pair of size 13 black sneakers, size 13 black "Lugz" shoes, size 44 jeans, a grey "Cyberteck" jacket (XL) and a plastic Foot Locker bag. The defendant was arraigned on the felony complaint later that morning.

## Uda Hidalgo

At 3:50 p.m. on November 17, 2004, Detectives Gugliuzza and Torre took a sworn statement from "Urayoun Hidalgo." Upon being informed of the subject of the inquiry, he said that at the time of the shooting, he was with his girlfriend, Helyna Rivera (whom he would later be convicted of killing), and their daughter at his house at 403 Prospect Avenue watching wrestling on television. He then learned of the killing on the 10 o'clock news. He could not account for the whereabouts of his brother, Efrain (Cheko) Hidalgo. He also said he did not know Josue Ortiz. He denied shooting the Camachos and said he had neither met them nor been

-16-

to their house. He claimed to have no knowledge of who committed the crime.

### Competency Proceedings

On November 22, 2004, the defendant was ordered by the court to undergo a CPL 730 competency examination. On November 29th, the director of the Office of Forensic Mental Health Services requested that the examination be delayed until the defendant could be stabilized with medication. In his letter to the court of December 3, 2004, the director noted that the defendant had presented to the Holding Center on 11/17 in an apparently perplexed and frightened state. Though responsive, his answers seemed irrelevant and he displayed a blunt affect. His demeanor vacillated from combative to silent.

The defendant was transferred to the CPEP Unit at ECMC Hospital on November 23 where his behavior went from agitated to catatonic. The hospital notes describe him, by turns, as suicidal, bizarre, in need of physical and chemical restraints, irrational, illogical, preoccupied and psychotic. His history reflected chronic depression and both alcohol and substance abuse. As of early December, 2004, he was diagnosed as suffering from a psychotic mental illness and was deemed to be "incompetent."

The attending physician diagnosed the defendant on November 30, 2004 as having undifferentiated schizophrenia. He also found the defendant to be incompetent. Regarding the homicides, the attending doctor notes that "the patient was friends with the 2 people whom he is accused of murdering." He reportedly saw them "socially" and had attended their funeral. "However, for some reason after that,...without any warning, (he) confessed to police about committing these murders." The defendant was prescribed Zyprexa and further psychiatric treatment.

-17-

## Erie County Grand Jury Proceedings

The Grand Jury heard testimony from the Medical Examiner (cause and manner of death), Officer Torres, Detectives Stambach (confession), and Maroney (evidence collection) and Luis Camacho. Luis testified that Flaco called him requesting that he come over fast and armed because something happened to Lobo. He went to the house and found Lobo, turned him over, determined it was him and then went into the kitchen where Flaco was laying on the floor with a gun in his hand. Flaco gave the gun to Luis who was on the phone with 911. He screamed out for the lady upstairs (Beverly LaBorgne) and waited for the police to arrive. Upon arrival, the officer ordered him to drop the gun whereupon he was thrown to floor and handcuffed.

Luis Camacho identified a photograph of the defendant who, he said, had come from Puerto Rico a few months ago and whom he'd met at a neighborhood bar. He mentioned that the defendant had attended his older brother's birthday party and had been at Luis' house visiting his family. He did not know the defendant's name. The defendant was indicted on December 6, 2004 and charged with four counts of Murder 1st degree, four counts of Murder 2nd degree and Burglary 1st degree.

Several weeks later, on December 29, 2004, the defendant was discharged from the hospital and returned to the Holding Center. Evelyn Coggins, MD, saw him on January 13, 2005 and observed that while still unfocused, he appeared more relaxed and appropriate. He was doing much better when she saw him again on January 21, 2005. She noted that his thoughts were organized but he complained of hearing voices saying, "it was you." He was no longer overtly suicidal. Dr. Coggins diagnosed him as suffering from psychosis, possible schizo-affective disorder/bipolar, but found that he was no longer incapacitated under Article 730.

At a competency hearing held in May, 2005, Dr. Coggins testified that the defendant had professed his innocense of the charges in their meeting of January 21st. In fact, he told her that he'd had nothing to do with the murders every time they spoke. Dr. Coggins opined that the defendant could have been suffering from a serious mental illness as of November 11, 2004 and may have been experiencing his first psychotic break from reality. (The defendant was found by the court to be competent on July 20, 2005).

### Ronnie Williams

Two months later, on September 3, 2005, one Ronnie Williams, a jailhouse informant claiming to have been housed with the defendant at the Holding Center, reported to Detective Stambach that the defendant had admitted (in English) to killing the Camacho brothers. The defendant reportedly said that he was only "acting like he was crazy" and had "fooled them suckers." He also said that he was high when he kicked in the door and shot them both. He had learned from friends that the Camachos were drug dealers who reportedly had money and a winning lottery ticket. The other two guys who helped him stayed outside. He also mentioned that his attorney had asked him if he was going to plea and he said that he was not going to take a plea. (Why the defendant would jump into the lap of law enforcement and gratuitously confess to two murders when he wasn't even a suspect and then brag about fooling the police by feigning crazy is entirely unclear).

### The Defendant Pleads Guilty

In any event, on March 22, 2006, the defendant pled guilty to two counts of Manslaughter 1st degree upon a sentence commitment of 25 years concurrent determinate and five years PRS. Before entering the plea, the defendant (with the help of an interpreter), stated that he was 24

years old, spoke a little bit of English, went as far as the eleventh grade and was taking medication but felt good mentally and physically. After claiming to understand the charges and the likely consequences, the defendant acknowledged that he "intended to cause serious physical injury ...to kill... (Miguel and Nelson Camacho), and killed them by means of "a rifle, rifle, shotgun."

In his pre-sentence memorandum, defense counsel recounted the strange circumstances of the defendant's confession and psychiatric break down and surmised that he may have been recruited for this crime because of his size (6' 5" tall and 295 lbs. according to the Pre-Sentence Report [PSR]) and susceptibility to intimidation. The PSR indicates that the defendant declined to make any statement to the Probation Department about the offenses and reported that "he had made a decision to withdraw his guilty plea." He also reported a "history of ...mental health disorders" beginning in 2000 which included hearing voices and seeing people who were not there. He claimed to have been prescribed Paxil, Deserol and Vysturel. He said that he had been taking no medications since coming to Buffalo up to the time of his incarceration. Although he reported no history of illegal drug use, the forensic records indicate a history of alcohol, marijuana and Xanax abuse.

<u>Sentencing</u>

At sentencing on June 16, 2006, defense counsel reminded the court that the plea had come about as a result of the defendant's having advised counsel on his own that he wished to do so. Then, on the day before sentencing, counsel received a letter from the defendant (possibly written with the help of another inmate), indicating that he had changed his mind and wanted to withdraw his plea. Since there was no claim that the plea had been coerced or otherwise forced

-20-

upon the defendant, counsel saw no legal basis to move to withdraw. The defendant repeated his desire to withdraw his plea but offered no reason other than his change of mind. Counsel made a pro-forma motion to withdraw the plea which the court summarily denied. Noting that the defendant was someone who appeared to be "easily led," the court imposed the promised sentence.

### Subsequent Psychiatric Records

Records from the Central New York Psychiatric Center described the defendant in 2007 as being 6' 5" tall and having below average intelligence. On January 29, 2008, he said, "I know I did wrong but everybody makes mistakes." Ten months later on November 23, 2008, he reportedly exposed himself, relieved himself on the floor and was babbling in Spanish and English. He appeared to be "constantly...responding to internal stimuli." A year after that, on November 18, 2009, he wondered how he could turn out the way he did when he was raised in a good, hard working family. He said that he had "made a bad decision and has to deal with the consequences." (Whether he meant killing the Camachos or pleading guilty to crimes he didn't commit is unclear).

### The Federal Investigation

While the defendant was marking time as a sentenced prisoner, the United States Attorney's Office was investigating a variety of criminal activities (RICO violations, drug dealing, murder) on the west side of Buffalo including the Camacho homicides with a particular focus on Misael (Misa) Montalvo, Efrain (Cheko) Hidalgo, Brandon Jonas and Carmen (Millie) Justiniano (Montalvo's girlfriend). Testimony was presented to a Federal Grand Jury on multiple dates in 2011 and 2012 resulting in an indictment for the above-named individuals on November

8, 2012. Montalvo, Hidalgo and Jonas were charged with the murders of Nelson and Miguel Camacho. Noticeably absent from this indictment was the defendant.

### Interview of Defendant at Auburn Correctional Facility

On June 29, 2011, Buffalo Police Detective Mary Evans and State Police Investigator Geraldo Rondon interviewed the defendant at the Auburn Correctional Facility. He said that he did not want to discuss the details or be a snitch. When asked if he felt that the other participants were after him, he said, "no." They asked about the AK-47, a .9 mm handgun and a shotgun and the defendant said that he ran to 7th Street after the homicides. He added that he "lost my mind for awhile. I don't know why."

The detectives showed the defendants photos of various individuals including Cheko Hidalgo and Sammy Ortiz. He only said that Ortiz looked like he might be familiar.

Two weeks later, on July 14, 2011, the detectives interviewed the defendant in the presence of the federal prosecutor. He recounted that he'd moved to Buffalo after spending a lot of time in jail in Puerto Rico. He got involved with the same type of people on 7th Street as he did in Puerto Rico. He said that two of them were with him during the murders of Nelson and Miguel Camacho. He had heard that they had won the lottery and were making a lot of money. When they went to the house, he could see someone inside through the window. He hit the door and it opened. One male was by the front and a second male emerged from the back carrying a cell phone and saying something about "killing my brother." He originally thought it was a gun. He had an AK-47 and the others had a .9mm and a shotgun. The male at the front was shot first and then he shot the male with the cell phone. He also tried to rip a gold chain from one of the victim's necks. After all the shots were fired, they scanned the apartment for money and drugs

-22-

but did not take anything. The then left the apartment and he ran to 7th Street where he was living.

The defendant was then shown photo arrays which included Brandon Jonas (he identified two others in that array as people he recognized but not Jonas), Uda Higalgo (no hit) but he did say he'd met Uda at Ashley's or LaLuna; and Cheko Hidalgo ("I recognized him. He lived near me on 7th Street") but did not know his name. He did not wish to sign any of the photo arrays and expressed concern about being shown photos in the Grand Jury.

### Defendant's Federal Grand Jury Appearances

The defendant was presented to the Federal Grand Jury on July 14, 2011, and was asked without counsel or promise of immunity about his activities since arriving in Buffalo in May of 2004. Upon being asked if he had met an individual named "Uda," he requested an attorney. The prosecutor than advised him of the nature of the investigation (RICO, VICAR, Hobbs Act, Robbery), and of his right against self incrimination and to have counsel. He then said that he had met Uda. However, when asked if he and Uda had planned to "rob some guys," he repeated his request for counsel.

The defendant re-appeared before the Grand Jury, this time with assigned counsel and testified pursuant to a written immunity agreement with the government. He repeated that he had met Uda and his brother "June" (last name unknown) at a west side bar. He stated that he had heard on the street about two brothers who were making a lot of money and who had hit the lottery. So, he decided to "step up to try to find some money and drugs." Figuring that they would be "a good target to rob," he discussed the idea with the other two guys who lived somewhere in the Seventh Street area. He said that the plan was "not to hurt the victims,

-23-

(b)ut...everything became wrong." (i.e. they were expecting to find something but it wasn't there).

The defendant stated that Uda and his brother picked him up at his apartment at 550 7th Street in a green Toyota Corolla. Uda drove them and the defendant brought an AK-47. Uda had a shotgun and his brother had a .9 millimeter. They drove a couple of blocks and parked on Seventh Street near Massachusetts and Niagara by Zip's Store. When asked what they were wearing, the defendant said, "I remember I used to have a black hoodie (which was up), a pair of pants, but I used to get like a costume dress to cover my weapon." He said he put the AK-47 down his baggy jeans and tied it over his belt. As to the brothers, he said, "...you can say they got the same clothes. They ain't got the costume dress, but I believe he got a big army coat." The brothers also wore hoodies.

The defendant went on to say that at around 9:30 p.m., they crossed the street and went to the house which was "like three or four houses over on Massachusetts and Niagara," where, through the window, he "saw one of the Camacho brothers...sitting down, watching TV or whatever it is." He had met them before at the Famous Corner Bar. The defendant said that he was going to knock on the door but kicked it. He went in, "they looked at me...and I started talking to them in Spanish, (saying), where's the money?" He added, "we didn't find none, (h)e's fighting and everything, we came there, so I shot them."

When the defendant entered with his gun out, Uda and his brother were behind him holding guns as well (he believed). The defendant pushed past the first victim and "bring him to the floor and I did what I did." When asked if he had any jewelry that he tried to take, the defendant replied, "(y)es, he got a nice chain," which fell to the ground. He described the first

-24-

victim as being, "a little scared and...tough." The defendant said, "where is the money and drugs," to which he replied, "I don't know what you're talking about." At that point, Uda and his brother were searching for drugs and money at his direction.

The defendant turned the AK-47 on the first victim and shot him "in the face...and his arm, I believe," because he was a little angry and frustrated. As the other two were running through the house, he heard the other victim's voice saying, "we was killing his brother." Specifically, he said, "(y)o come here, they're killing Lobo." When asked what happened next, the defendant said, "I ain't gonna lie. I felt a little concerned, not scared,...because I don't know if somebody is going to get a pistol and shoot at me or something. (W)hen he was coming out of the room, I ...seen his hand (and)...thought it was a gun, but basically, I thought it was a cell phone, but it looked like a gun because it was a little darker, (s)o I decided to shoot him too." (The .25 caliber gun found at the scene was reportedly silver or chrome).

When asked if Uda and his brother were also shooting, the defendant said, "I think yeah, you can say that, yeah." The prosecutor then asked him that "if the crime scene indicated that all three guns were used, would you agree with that assessment, that everyone was shooting?" the defendant eventually said yes. (Why the prosecutor said this is not clear inasmuch as the ballistic evidence suggests that only one type of gun, an AK-47, was fired).

After shooting the second victim, they quickly searched the apartment and ran out the front door. The defendant said they split up with him running back to his apartment and the others (he believed) got into the Corolla and also went to meet him at his apartment. He then said that he crossed Niagara Street and turned left onto Seventh Street while the others went the opposite way toward Massachusetts (in the opposite direction of the car). He was then asked,

"(s)o there would've been two people running down Massachusetts in one direction and one person running down Massachusetts in the other direction?" The defendant replied, "Massachusetts and Seventh Street, yeah. But the car...was on Seventh Street." So, even though the defendant ran toward the car, he didn't get in but made a left turn and ran down Seventh Street. (Why he said the others ran away from the car down Massachusetts after previously saying that they had gotten into the car is not clear).

Regarding the AK-47, the defendant testified that he "tried to cover it the most I can but I didn't put it in my pants." He repeated that he returned to his apartment (where he kept the gun) but did not know where Uda and his brother went (contrary to his earlier claims). He did say, however, that he met them there sometime after and they remarked how "everything came wrong." Uda said, "it's my fault" because he'd led them to believe that there would be a ton of money and drugs. Uda and his brother later told the defendant that the guns were safe.

When asked if he'd told the police that he'd thought that the second victim had a gun in one hand and a cell phone in the other, the defendant said "yes" but added that it was dark. He "believed" he may have also told the police that he'd thought Uda and his brother were going to come after him. (BPD police reports do not indicate the defendant mentioning any names other than Ricardo Velasquez in this regard).

The defendant, described Uda as being light-skinned, 5' 7" to 5' 8" tall with short and tight hair (like the defendant's) and normal (not chubby) build. He estimated his weight to be between 170 and 180 lbs. (A Federal Marshall's booking from 6/5/12 lists Uda Hidalgo as being 5' 6" tall and 220 lbs., DOB 6/20/84).

The other brother, according to the defendant was "more shorter than him." He was also

-26-

light-skinned but older and wearing a "blow top" hair style.  (It is not clear who "June" is but a Federal Marshall's booking form for Efrain Hidalgo dated 5/31/11 lists him as 5' 10" tall, 225 lbs., DOB 6/11/86).

The defendant was shown a photo array and asked if he recognized #2 to which he said that he "used to meet him before he got busted...(he) used to live all the way down Seventh Street...(u)sed to call him Chello."  (The record does not so indicate but it is believed that this photo was of Cheko Hidalgo).  The prosecutor asked the defendant if this individual was with him that night and the defendant said, "no."  When asked if he was being "100 percent honest about that," he replied, "100 percent."  At that point, the prosecutor warned him that dishonesty could invalidate their agreement and he said that he understood.

The prosecutor then showed the defendant another photo array (believed to contain a photo of Uda Hidalgo).  When he said with "100% honesty" that he did not recognize anyone, and specifically "did not see Uda there," the prosecutor invited him out of the Grand Jury.

<u>Luis Camacho - Grand Jury Appearance</u>

On November 3, 2011, Luis Camacho appeared in the Grand Jury and testified that Flaco called and asked him to come over with a weapon because "something happened to Lobo."  Luis (along with his girlfriend and her child) drove over and came to a stop at the traffic light at Niagara and Massachusetts when he saw two guys (pretty skinny and fast, not big) in hoodies (one yellow) running across the street, in front of a truck, toward Massachusetts.  He went into the house and saw Lobo face down and then proceeded to the back where Miguel was laying against a door holding a little gun.  He gave the gun to Luis, the cops came, pinned him down and took him to headquarters.

-27-

Luis said that he had met the defendant a couple of times but did not believe that he was one of the two guys running across the street. He said that the defendant is tall and big while the two runners were small (120 - 130 lbs.), and he would have known if it was the defendant. He was unaware if the police had found drugs or money at the house and said that Nelson only sold drugs to friends. He claimed that he and his brothers were occasional users. He said that the police gave him the gold chain found on the floor (which he later returned to Detective Evans) and $3,700.00 in cash. He also stated that Lobo had told him that Misael (Montalvo) had tried to "turf" (i.e. hit on) his girlfriend and that he (Luis) had slapped him (Montalvo) at a bar.

<u>Jeilyn Rosario Grand Jury Appearance</u>

Jeilyn Rosario also testified on November 3, 2011. She resided at 879 Niagara and was generally aware that Nelson and Miguel were involved with drugs which they (along with Pedro Salsa, Misael, Canario [Luis Camacho]) would discuss on a weekly basis in the back room.

About a year before the killings, Misael had tried to kiss Jeilyn who reported this to Canario. He and Lobo called Montalvo and a couple of months later, Lobo punched him out in a barber shop. After that, Montalvo stopped coming over to 879 Niagara Street.

On November 11, 2004, Jeilyn was home all morning with Lobo and Flaco and Canario who had been partying for a couple of days. She got into an argument with Lobo over her cooking so she went to her sister's house. Lobo then called her and, after a scheduled pool game was cancelled, invited her back over to watch movies. When she got there, she saw the police and was advised by her friend "Poocha," that Lobo had been killed.

Jeilyn said that she heard that a guy named Josue Ortiz had taken a plea in connection with her boyfriend's murder. She noted that he had signed the funeral book (as did Tito, Misael

-28-

and Luis) but said that she had "never seen him around Misa, Lobo, Flaco or Canario before."

She agreed that he was a "tall guy" and said that he looked familiar "when she had seen him in court.

## Further Police Contact with Misael Montalvo

According to a police report of November 21, 2011, State Police investigators (Geraldo Rondon and Josh Keats) interviewed Misa Montalvo on November 19, 2011 after he had been pulled over on the Thruway while driving from New York to Buffalo in a rental car loaded with cocaine. He said that he'd left Buffalo in 2004 because there were no jobs available and people were spreading rumors that he was involved in the deaths of the Camacho brothers. He also said that he and Nelson argued over a rumor about him and Nelson's girlfriend. He said that they were like brothers but things had gotten out of hand and they never made things right between them.

He mentioned that he had spoken to the police about the rumors and he was told that "everything was ok." He recalled that "someone" had gotten arrested and was doing time for the murders. When asked if he knew that person, he said, "no." He also said that he had heard of Uda Hidalgo but did not know him. (He did not identify him from a photo array). Upon being shown a photo of Cheko Hidalgo, he nervously replied, "he's Cheo, Chemo, Cheko, who was arrested for being a leader of the 7th Street Gang." He denied every having any dealings with Cheko and said he was not involved in "hurting others." He recognized a photo of Brandon Jonas (Cheko's cousin who was always with him in the neighborhood). He said that at the time of the homicides, he was driving a yellow Toyota Tercel which people referred to as the "Sponge Bob" mobile. He stated that he did not go to the Camacho brothers' funeral because of threats

against him and his family. (He denied any knowledge of the drugs found in his trunk).

### Angel Rivera Grand Jury Appearance

On January 19, 2012, Angel Rivera testified (pursuant to a proffer agreement with the government) that he had dealt heroin with Cheko, Uda (brother) and Frank (father) Hidalgo on the west side of Buffalo. He met Misael Montalvo in October, 2011 at the ECHC. Montalvo explained how he was transporting coke back and forth from Queens to Buffalo in Enterprise rental cars until he had gotten pulled over with cocaine in the vehicle. He also mentioned driving a couple of guys "back in the 90's" on Niagara Street for what was supposed to be "a little armed robbery" but ended up with "somebody getting killed." Rivera recalled Montalvo saying that he had a yellow car. (The prosecutor confirmed that Rivera's cooperation would be conveyed to local prosecutors in connection with a state indictment pending against him).

### Kevin Walsh Grand Jury Appearance

Another jail house informant, Kevin Walsh, testified (pursuant to a proffer agreement on a federal marijuana case) on February 2, 2012 that Montalvo spoke to him about his intrastate drug dealing activities. He also told Walsh that he'd moved to New York City because he was worried about being brought up on murder charges. He explained that about a month before the killing, he'd had a falling out with an individual who had threatened him and his family. Walsh said, "who cares," whereupon Montalvo said, "I was the driver." He said, "I dropped him off at the deli." He also told Walsh that he had "done business with the guy" from 1988 to 2004 until they had a falling out and the guy threatened him and his family.

Montalvo expressed concern about some jail house "keep aways" that included "the

shooter." He also mentioned that one guy had gone to the funeral and "kind of flipped out...and...kind of took responsibility for it," but "he's not the guy. He's not the shooter." He said the actual shooter was at the ECHC and the guy who took responsibility was "messed up in the head." Montalvo said "that guy just killed somebody in Puerto Rico previously and he was kind of loopy, (but) he was not the shooter."

<u>Timothy Ernle Grand Jury Appearance</u>

On August 9, 2012, Timothy Ernle testified (pursuant to a proffer agreement in connection with a bank robbery charge) that he shared jail space with Montalvo from February to July 2012. Montalvo was "frantic" about a possible indictment on the murders. He said there were two sets of brothers and that "Uda and Cheko committed the murder and pulled the trigger." Montalvo further explained that he was friends with Lobo and Miguel but had gotten into an altercation with them about a female. He was copping drugs from one brother (Miguel) and made a move on the other one's (Lobo) girl. The brothers then told him that their relationship was over and he needed to pay them what he owes and keep walking.

Following the altercation, Miguel was pressing him for money, so he approached the other two brothers and made up a story out of anger. He reportedly told Uda and Cheko that there was a large amount of money and drugs in the house and if they helped him take care of this problem, he would allow them to keep the money and split the drugs. He said that they lived on Niagara Street between Rhode Island and Massachusetts near the "Town Pizza" Shop.

Montalvo recounted that he, Cheko and Uda drove there, the two brothers went into the house with a shotgun (while he was outside in the car). They shot them once in the head and in the body but there was no money or drugs. Uda came out and threatened to kill Montalvo

-31-

because there was no money or drugs in the house. Montalvo said he spoke to the police that night and started getting threats from both the victim's family and the killers. So, he moved to New York City. He also explained that he'd spoken to the police to take the heat off himself and had managed to do so for a number of years.

<u>Frank "Macho" Matias Grand Jury Appearance</u>

Frank "Macho" Matias appeared before the Grand Jury on August 30, 2012 pursuant to a grant of immunity for his involvement in the Camacho homicides. He stated that he was visiting his friend, Sammy Ortiz (Machito), at Sammy's father (Sammy Ortiz aka Loco's) house on Seventh Street when Cheko and Brandon came over carrying packages. Once inside the house, they pulled out an AK-47 and an SKS rifle. They removed the clips and wiped off the bullets. Then, Sammy Loco came in with Misa and they all went into the kitchen. Misa started talking about Lobo and a lottery ticket. He also said he was going to drop them off. Cheko then pulled Macho aside and said, "you're going with me." Macho asked where and Cheko said, "don't worry about it."

Brandon grabbed the AK-47 and walked out with Cheko and Macho. They then got into Misa's "yellow old school" Toyota. Misa drove, Cheko sat in the front passenger seat and Brandon got in the back seat with the AK-47 along with Macho who had no weapon and was wearing black jeans, a black or royal blue hoodie and black Nike sneakers. Brandon and Cheko wore the same kind of sneakers, but white in color. Cheko wore a gray, zip up hoodie and Brandon had a "throw over gray hoodie."

En route to the house, Misa told Cheko that there would be a bag containing five kilos and up to $20,000.00 in cash just inside whereupon it dawned on Macho that they were about to

do a stick up. Macho, who was 15 year-old, started to panic and Brandon sat there with the gun, "calm as the sea." They also planned to "flip mattresses" for drugs and the money was supposed to be there because they had supposedly just won the lottery. Cheko asked how many people would be there and Misa said, "one." He then proposed to drop them off on Massachusetts and meet them all later at Sammy's house on Seventh Street.

They drove as far as Zip's store where the three of them (Brandon with the rifle, Cheko with a bat and wearing gloves), got out of the vehicle. Shortly after that, they were confronted by Germick Catalan's father (Tebo) of 53 Massachusetts Avenue who told them to get away from his house. Macho said, "hey, it's me," and they walked onto Niagara and crossed the street to go to Pizza Town. Before doing so, Brandon put the rifle down and Cheko laid down the bat by an abandoned house. Cheko bought some pizza and wings after which they went back across the street. Cheko explained that they were waiting for somebody to get to the house. Macho stated that he had cold feet and Brandon got angry and threatened to blow his head off if he backed out. Cheko said, "if you don't (go through with it), I can't stop him (Brandon) from doing anything." So, Macho decided to stick it out and it would be his job to rummage through the house.

Cheko warned Brandon not to shoot anyone because he's trigger happy. As they were talking, a black car pulled up and a male (wearing a hoodie, shorts, slippers and socks) and a girl walked into the house. Cheko handed Macho the bat and broke the door down with his shoulder. Macho heard a guy inside screaming, "what's going on," and Brandon stormed in with the AK-47. Cheko grabbed the bat from Macho and pulled him inside.

Brandon fired a shot and the guy was "leaning down (as) blood was leaking from his arm." Macho said, "Cheko we have to help this man," Cheko said, "nobody gets to say names."

-33-

Cheko grabbed "some other guy's necklace and ripped it off and pulled me into the room...and said look around." Cheko flipped a mattress but nothing was there. He also searched a closet, some drawers and broke the door down into the kitchen where another man (the one who had entered the house a few minutes earlier) was located. That individual had a silver gun in his hand and was pointing it at Macho's chest. He pulled the trigger but the gun did not fire. (Matias assumed that he did not release the safety).

Cheko called out to Brandon who confronted the guy with the gun saying, "you think you crazy?" He then squeezed the trigger on the AK-47 and the guy was "bouncing up on the wall and...just slid down." Macho then ran out of the house. On the way out, he passed by the first guy who had been shot. As he approached the curb he heard another gunshot. He then ran up Niagara to Massachusetts and then headed toward Columbus Parkway. Brandon, who still had the gun, ran past Macho along with Cheko who no longer had the bat. As they came to Porter Avenue, Brandon tossed the gun into some bushes a few houses down from the gas station at Columbus.

When they got to Seventh Street between Porter and Jersey, a police car drove by and turned its lights off. They acted as if nothing was wrong. They ran through some yards, still aware of the police car, and went to back to Sammy Ortiz' house. When they got inside, Sonya (Sammy's wife) Ortiz took their bloody clothes, tied them up and took them into the basement and ditched them in a hole in the wall. (On November 19, 2012, police investigators performed a "cadaver search" of the basement at 482 Seventh Street and while the canine alerted them to the west side wall near a crawl space, there were "no visible articles of human remains.").

Shortly thereafter, Misa arrived followed by the police who asked Sonya whether anyone

had run by the house. She said, "no, the kids were here the whole time," and the police left.

When Sammy entered with Misa, Brandon and Cheko "went crazy." Brandon grabbed him and said, "I'm going to kill you. You set us up. There wasn't shit in there, you stupid motherfucker." Cheko said, "(t)hey both fucking dead and you set us the fuck up." Misa replied, "I swear, there was only supposed to be one guy," but Cheko and Brandon wouldn't hear it.

Sammy stepped in with the SKS and told everyone to calm down but Brandon was still pacing and talking trash. Both he and Cheko told Misa, "you better leave Buffalo because you're going to die too." They then turned to Macho and said, "(i)f you say anything, you're going to disappear." Macho then called Germick to pick him up. After he did so, Macho told him what had happened and Germick said he already knew because his father (Tebo) told him that he'd seen him earlier in front of his house.

Macho said that they did not enter the very back room of the house and he did not know whatever became of the female who went into the house with the male before they entered.

After the homicides, Macho laid low at his baby's mother's house in Niagara Falls. A few weeks later, he returned to the West Side and was confronted at a Chinese restaurant by Cheko who said that they'd all been questioned and wondered if he had been squeezed as well. Macho said no and Cheko said, "if you're talking, you're going to disappear too."

He later ran into Uda who said that he had been taken downtown with his girlfriend by police. He said he told the police that he didn't know anything about the homicides. He then asked Macho what happened and Macho said, "I really can't talk about it." From that point forward, everyone pretty much kept their mouths shut.

Matias recalled hearing on the street that someone got arrested and convicted of these

-35-

killings. When he learned it was someone other that Cheko or Brandon, he was in shock. As for the defendant, he said, "I don't know what he looks like." He insisted that no one other than the three of them (and Montalvo) were involved. He later heard that Cheko was glad that someone else got picked up so "we don't got nothing to worry about." He also said that he didn't know who the hell the guy was and that he was dumb for admitting something like that.

Macho also said he believed that the AK-47 had been destroyed. He did not recall any of them having or using duct tape during the crimes. On August 16, 2012, Matias viewed photo arrays and identified Cheko, Misa (the man with the plan), Brandon (the shooter) and Uda.

### Frank Coppola Grand Jury Appearance

Also on August 30, 2012, Frank Coppola testified that he had left his home at 31 Rich Place and was heading for Zip's to buy cigarettes when he heard muffled gunshots. After purchasing the cigarettes, he left the store, he saw three young men with hoodies up running diagonally across the street very fast. As they passed him, one of them threw something in a yard and they proceeded down Niagara and turned left on Massachusetts toward Busti. He observed an aluminum baseball bat and when he reached his front door, someone came out the house across the street screaming.

Coppola called 911 and pointed the bat out to the police when they arrived. (Evidence records reflect that police collected a blue aluminum bat in the yard at 53 Massachusetts). He described the suspects as appearing to be Hispanic and of average build and height.

### Beverly Laborgne Grand Jury Appearance

Beverly Laborgne, the upstairs resident at 879 Niagara Street testified on August 30, 2012

that she was playing games on her computer of November 11, 2004 in the front room when she heard rustling and banging sounds of people kicking in the front door and coming inside. She then heard people arguing in Spanish followed by "a good seven rounds" of gunshots. Her husband got up and called 911.

Laborgne looked out her front window and saw "(t)hree guys going one-by-one (in a straight line one right after the other) down the front stairs and the third one was holding a rifle the long way...up against his leg." She described them as wearing "baggy clothes and hoodies." She did not see their faces, nor could she tell how tall they were. They ran across Niagara Street and proceeded to the right toward Massachusetts.

Laborgne and her husband went downstairs and found Nelson on the floor with a gunshot wound to his face, eye and leg. She also observed Nelson's brother (Luis) who arrived before the police. She did not go far enough inside to see Miguel.

<u>Peter Delgado Grand Jury Appearance</u>

Peter Delgado, a parolee recently released from prison on drug charges, testified in the Grand Jury on September 13, 2012 that in 2004, he and Angel Torres (since deceased) had acquired an AK-47 (brown and black) and an SKS which they kept at Delgado's brother-in-law, Waldemar Ramos' house in a closet at Busti and Jersey. The guns were stolen and Delgado had been told by Hiram Rosado (Chiquito) as they were driving by 879 Niagara that Cheko had stolen the AK-47 and used it in the murder of the brothers on Niagara.

<u>Eduardo "Beko" Rivera Grand Jury Appearance</u>

The defendant's former housemate, Eduardo Rivera also testified on September 13, 2012.

-37-

He said that he and the defendant sold drugs out of 19 Hoyt Street for Justo and Juan Galarza. Rivera described the defendant as someone who really didn't know his way around the neighborhood. He'd get lost going to the corner store. He recalled that the defendant ("Joey") took Xanax and did cocaine.

Rivera learned of the Camacho murders when Justo (Canario's best friend) came over the following morning and advised him and the defendant that they had been killed. The word on the street was that one of the brothers (Lobo) was shot in the face and the other was at the back door. The perpetrators were supposedly caught on Zip's store camera running from the scene. The defendant started pacing around and Rivera asked him what was wrong. The two of them then went to the store and en route the defendant jumped into a police car that had pulled up. A female police officer asked, "what's wrong with this man," Rivera said, "what is you talking about," and the defendant blurted out, "I did it." Rivera said, "Joey, do you even know what you is talking about?"

Detectives arrived and asked why he was saying that and Rivera said, "I don't know, I don't know what's wrong with him." Rivera then called the defendant's cousin, Valeria and said, "your cousin flipped out and is talking nonsense saying he killed Lobo and his brother over there on Niagara." The police then put him in a car and drove him away. He eventually ended up at ECMC where he wouldn't speak to anyone.

Rivera said "there is no way" the defendant could have done the killings because the two of them were always together at 19 Hoyt and kept track of each other and the house cameras did not show him leaving on the night in question. He surmised that everything the defendant told the police was based on what he had heard. He also opined that the defendant was angry at God

-38-

over the death of his mother and must have gone crazy and blamed himself for the homicides.

## The Defendant Revisited

On July 11, 2012, Detective Evans and an investigator met with the defendant at Attica State Prison. He asked them why they keep asking him questions and said he had nothing more to say about the homicides. Nevertheless, they asked him whether he had left the house from the front or back door. He asked why they wanted to know and they said because it would be helpful to the investigators.

Investigator Rondon then asked, "(w)ere you even there," to which the defendant, seemingly surprised, asked, "(d)id you find my DNA at the scene?" The investigator said he didn't know but if the defendant recalled touching anything, the lab could compare it.

They then asked him why he attended the Camacho wake and he replied that in Puerto Rico, people go to see who attends to try to determine who may have committed the crime. He said that the Camacho brothers were not bad people.

## The Defendant Claims He is Innocent

A follow-up interview which included the federal prosecutor occurred at Attica on September 6, 2012. They informed the defendant that people were claiming that he did not commit these crimes and that certain details did not match up with what he had told police in 2004. (They advised him that they had spoken to his friend, Eduardo Rivera). The defendant recalled "moving with him" out of 19 Hoyt Street.

The defendant then said, "OK, I'm innocent." The prosecutor asked him why he had said what he did back in 2004 and he replied, "(y)ou could say that I was scared...but I didn't know what I was scared of. Back then, I kinda lost my mind for awhile. I'm not gonna lie. I did some

things in Puerto Rico. I was in Buffalo about four or five months at that time. I was doing a lot of coke, lortab bars and marijuana. I heard some stuff in the street (about the homicides). I think people said it was over a lottery ticket or something. When I spoke with the detectives I had been up for three days."

The defendant said that he was not in the house at all when the homicides took place. He believed that someone (he could not recall who), had told him about the homicides. When asked if he had ever heard of "Uda," he said, "no." He said he had heard of Cheko but did not know him. He also claimed not to know or to have heard of Sammy "Loco" Ortiz, Sr., Sammy "Machito" Ortiz, Jr., Sonia Ruiz or Misa. He was not familiar with 482 Seventh Street (Ortiz' house) but said that he used to stay at 550 Seventh. When asked if he had heard that one of the victims had made a phone call during the break-in, he replied, "(y)eah, you heard a lot of shit in the street."

The investigator asked the defendant if he ever wanted to take back what he had told the detectives and he said, "(y)eah. I told my lawyer I wanted to take it to trial." When asked if he thought he would "beat it" at trial, he said, "(y)eah, they offered me (four) pleas. The first was 30 to life, I said no. (T)he second was 25 to life. I said no. (T)he third was 20 years. I said give me a week and a half to think about it. I said OK. When my lawyer told the DA, they said, 'no, it's 25.' I told them I wanted to take it back but they told me it was too late."

Describing his feelings after being sentenced to prison, he said, (o)nce it was done I figured there was nothing I could do about it. I felt like I did when my mother died. It was something horrible that I knew I had to live with." He recalled ending up at ECMC and had heard on the street that a shotgun had been used to commit the homicides. He also recalled

having spoken to the detectives in Spanish since he spoke no English at that time. He said he had been to the (victims') house one time with a friend but he had stayed out on the front porch.

While in prison, he took medications until 2010 and stopped because it was tearing up his stomach. He then asked, "(s)o now what?" He was advised that he would need to tell the Grand Jury the truth and that many things needed to be done. They asked if he was now telling the truth and he said, "yes." He also said that he understood the difference between the truth and a lie.

<u>The Defendant's Return to the Grand Jury</u>

On September 13, 2012, the defendant testified that he had lied in 2011 by taking responsibility for something that he did not do. He recounted that he had come to Buffalo in May of 2004 to have a "better life" after he'd gone out of control with drugs in Puerto Rico following his mother's death in 2001. After coming to his uncle's house, he and his cousin, Reynaldo Velasquez started selling drugs out of 19 Hoyt Street. He met Lobo and Flaco at the Famous Bar where he saw them a lot. He'd been to their house one time in August or September of 2004 but had never gone inside.

The defendant testified that he had gone to the Camacho funeral with his cousins. Many people there, including Luis (Canario) Camacho spoke about what had happened. In particular, Luis said that Flaco had called him and said, "they was killing Lobo." Luis went there but arrived too late. The defendant had also heard that the incident "was for a lottery ticket, something like that," and that "they used a shotgun or something." The defendant described himself as standing 6' 5" tall and wearing a size 14 shoe.

The defendant said he was losing his mind after several days without sleep. He recalled walking with Beko and screaming when a police car arrived and he jumped into the vehicle. He

was then taken by ambulance to the hospital where he spoke to the police. After being released, he returned to 19 Hoyt. He bugged out again and called the police. He was transported to headquarters where he spoke to Detective Stambach (with Officer Torres interpreting).

Stambach asked questions and the defendant said, "I would really like to confess." They asked if he had something to do with the murder and he said, "yes." They gave him the name Uda, whom he didn't know, and his brother. After that, "they made me talk. They gave me food and a cigarette and I was talking and they were writing. When I finished, they read me my rights...and put me in the holding center..."

The defendant said that the detectives interviewed him for about 25 minutes before they typed up his statement. He acknowledged giving the answers set forth on the statement. When asked where he'd gotten that information, he said that the brother (Luis) was saying a lot at the funeral. "Everybody was talking about that." He also heard about it on the street.

One of the things the defendant said he'd heard was that Flaco and Lobo were making money dealing drugs and he'd also heard about a lottery ticket. He explained that his friends, the Galarzas, were friends with the victims and that is how he learned this. He had only thought at that time that the perpetrator had gone over there to assault the victims and the information about Flaco hearing the other brother yell reportedly had come from Canario at the funeral.

As for why he named three different weapons, the defendant said, "(a)ctually, I lied. At that point, I only heard about the shotgun part...I didn't know what weapons they used." When asked why he had told the police that he tried to take Lobo's chain, the defendant said, "I don't know." His statement about seeing money and drugs was not true and he said that he never went into the apartment. He thought he may have known Cheko, did not recall if he knew "Frank,"

said he never met Uda and he didn't know Brandon. He did not know Sammy "Locò" Ortiz but believed he knew Sonya Ortiz. He did not know Misael Montalvo.

The defendant was asked to explain why he had said he was involved and he said, "It's hard because I understand that I already put myself in this situation. Nobody telling me nothing but I started to lose my mind without sleep for three and a half days...the real truth is that I never killed nobody and that's the real truth."

When asked why he pled guilty, the defendant said his lawyer always had bad news and told him that he'd spend the rest of his life in jail if he went to trial and lost. He explained that they were going to "finish" him with the "detailed confession" and "they have somebody (the other lady) that saw me after the shooting running, which I didn't know." So, rather than spend the rest of his life in jail, he decided to take the plea. (In his pre-sentence memorandum, counsel states that the defendant advised him on his own that he wished to plead guilty).

On the day of sentencing, the defendant told his lawyer that he wanted to take back his plea and go to trial because he didn't do it. The attorney said "let's see what happens...but the judge said it was too late." (In the pre-sentence memorandum, counsel states that the defendant had simply changed his mind).

The defendant explained that at the time of his confession, he was under the influence of coke, pills and marijuana and operating for several days without sleep. He could not really account for scrapes and cuts on his body. ("I was walking and scratching on somebody's side, I don't know.").

The defendant testified that he received some mental health treatment in prison and initially took medication (Zyprexa, Remeron, Trazodone, Zoloft) but eventually stopped doing

so.

When asked why he didn't proclaim his innocence to the Grand Jury in July 2011, the defendant said, "I don't know...I should have said I'm innocent and I don't know nothing but I just ...keep quiet. I was a follower and I had decided to say a lot things that's not true." The prosecutor then asked, "(d)id you thank that regardless of what you said, you were still going to serve your 25 years?" The defendant replied, "(y)es I did. I always think about that, regardless if I say I'm guilty or not guilty, I wasn't thinking. One day I am going to come out. I am sentenced to 25 years so it doesn't matter if I say anything right now."

Asked if he was worried about "being a snitch in prison," the defendant said, "I ain't snitching." The defendant also expressed confidence that his DNA would not be on any evidence connected with the homicides. The defendant said that on the night of the homicides, he was at 19 Hoyt "with my man, Beko."

The defendant acknowledged telling Detective Stambach that he had shot Flaco "in the belly" and Lobo "in the face (and) chest (and) did a couple when he was on the floor." He said "(m)ost of the time, I am a follower. I don't blame him because I take my responsibility but when he asked me some questions I said yeah or whatever." He added that he'd heard at the funeral that Lobo was shot in the face.

<u>Defendant's Federal Counsel's Involvement</u>

In an affidavit submitted on August 28, 2013, Emily Trott, Esq. described her involvement in the defendant's Federal Grand Jury appearances thusly: On July 14, 2011, she was called in by the Federal Public Defender's Office to represent an un-named individual who was scheduled to testify before the Grand Jury. Three hours later, she met the defendant who

was accompanied by a Buffalo Police detective and a State Police investigator. She then met with the federal prosecutor who advised that the defendant had been "cooperating with law enforcement for several months on a particular case but had suddenly become a very reluctant witness." The prosecutor expressed concerns about possible perjury charges and asked counsel to instruct him on the legal consequences. Counsel was not informed about the nature of the Grand Jury investigation or that her client had previously pled guilty to Manslaughter in connection with it.

Counsel then spoke to the defendant with an interpreter for 10 to 15 minutes. At first, the defendant advised that the case was about drug dealing and that he had no problem giving testimony. (This appears to contradict his other counsel's argument that he'd falsely restated his involvement in the Camacho murders for fear that, by changing his story, he would somehow be charged federally in a drug conspiracy notwithstanding the grant of immunity that he received on July 21, 2011).

According to Ms. Trott, the defendant appeared more concerned about testing her knowledge of the streets than describing his testimony. After being advised of the penalties for perjury, the defendant returned to the Grand Jury only to be let out several minutes later. Counsel asked if there was a problem, and the defendant said that he was confused. He returned to the Grand Jury only to be escorted back out. The prosecutor informed counsel that the defendant was "now testifying in complete opposition to prior statements and was in danger of being indicted himself." Counsel then warned the defendant that it was foolish to think that the feds would not take action if he didn't cooperate. After further discussion with counsel and the prosecutor, the defendant returned to the Grand Jury.

The defendant was brought back out and the prosecutor advised counsel that his testimony was critical to the indictment of persons involved in a double homicide of two drug dealers. Counsel was informed that the defendant had information about their business operations and about the homicides but was refusing to testify about it. Counsel stated that up to this point, she had not had sufficient opportunity to address the "real reason" behind the defendant's reluctance to provide truthful information.

Counsel reminded the defendant of the implications of non-cooperation and stressed the importance of being truthful. She then asked if he had been threatened. He said no but was very reluctant to share details of the homicide with counsel. He inquired about the secrecy of Grand Jury proceedings wondering who might know of his cooperation and how it might be discovered. Counsel advised him of the "enormous protections" given to cooperating federal witnesses and he returned to the Grand Jury only to be escorted out yet again (and four more times thereafter). The defendant reconsidered cooperating and asked, without elaborating, about "additional crimes and future cooperation in Federal Court." Proceedings were then adjourned to work out an immunity agreement.

A written agreement was reached on July 20, 2011. Counsel met with the defendant the following day, reviewed the agreement with him (which he signed) and back to the Grand Jury he went. Twenty minutes later, the defendant came back out and the prosecutor was confounded by his testimony which was now "completely different." (How and from what it was differing is not entirely clear inasmuch as the defendant continued to implicate himself along with Uda and his brother, June. It was only when he was not able or willing to identify Cheko and Uda from photo arrays that the prosecutor showed him the door).

-46-

The defendant apologized for wasting counsel's time but said that he would rather sit in jail than endanger his life and the lives of his family and friends. He said that if he testified, these "people" would eventually find out and have him killed. Counsel asked why he had not said this sooner and he shook his head and said that it was better to be "safe in jail than dead on the street." He refused to cooperate further. Counsel warned him that he could be indicted and he replied that he was "safely serving a manslaughter conviction and federal charges were of little concern to him." (Again, this seems to contradict his other attorney's argument that he was untruthful on account of fear of federal drug prosecution). As previously noted, up to this point, Ms. Trott was "completely unaware" that the Grand Jury was investigating the very case in which the defendant had pled guilty seven years earlier. (Why she was kept in the dark by her client and by the government is entirely unclear).

One year later, counsel received word from the federal prosecutor that the defendant would be testifying in the Federal Grand Jury under "very different circumstances." Counsel met with the defendant whose command of English was markedly improved. He apologized for having misled counsel and stated that "dangerous people" were involved. He said that his knowledge of the homicides had come from the victim's brother who spoke about it at the funeral and he had tried to "play it cool" when he was told of the "terrible things about the murders after they had happened."

The defendant reportedly was "thrilled" that DNA would be exonerating him and that he would not be responsible for "snitching." According to counsel, in the defendant's mind, science had somehow revealed the true killers so he would not be telling on anyone. The defendant inquired how long it would take to clear him. He still felt wary of the real killers but felt safer

-47-

now that he had been excluded from involvement in the crime by the DNA and the federal investigation.

Through further conversation with the defendant, counsel was now aware of the state case and learned that he had taken a plea "against his attorney's advice." The defendant explained that his former attorney had "strongly advised him against taking the plea...but he (did) so because he was terrified that the brother who had (spoken about) the case would kill him had he gone to trial." (In his statement to Buffalo Police on November 15, 2002, he said he was afraid of Reynoldo Velasquez because he had a shotgun). In any event, the defendant explained that he was not cooperative with his former counsel because he didn't trust a non-paid lawyer who he surmised "must have been working with the District Attorney's Office.

The defendant also expressed his concern that the safety of his family and friends would be jeopardized if he had not taken a plea. He said that he'd never intended to tell the truth to anyone because he knew that Montalvo and Hidalgo were not afraid to commit another murder. In counsel's view, the real reason for the defendant's guilty plea was lack of trust of anyone and fear for his life.

The defendant returned to the Grand Jury and testified without any further interruption or delay. He also provided a DNA sample for comparison purposes.

<u>Luis Camacho Return to Grand Jury</u>

Luis Camacho returned to the Grand Jury on November 8, 2012, and stated that he was at home on School Street watching television with his girlfriend when Miguel called and said "come real fast and come armed, something happened to Lobo." Luis and his girlfriend, Yvette Maldonado, (and stepson) jumped in the car and drove over to Niagara. When he got to the stop

light, he saw two guys come out of the house very fast and run across the street by two big trucks.

Luis said he knew a big guy named "Joey" (about 6'6" tall) but he was not one of the two guys he saw running from the house. Luis then went inside and found Nelson with his face blown off and some of his jewelry (chain) on the floor. He then went into the kitchen and found Miguel laying by the door. He handed the gun to Luis who started looking for Lobo's girlfriend. The police came, knocked him down, took the gun and put him in a patrol car.

When asked if he'd told friends and family at the funeral what had happened he said, "I might, yeah. It's been a long time, but I don't recall it, but I believe I did, you know." The prosecutor asked, "it was a topic of discussion," and he said, "(y)up, yup." He mentioned that Yvette did not go in the house but stood on the porch screaming. He did not remember whether the upstairs neighbor came down.

## Jose Escalera Grand Jury Appearance

Jose Escalera testified pursuant to a proffer agreement in connection with federal drug charges on November 8, 2012. He spoke of meeting Misael Montalvo at the Holding Center at a time when he (Montalvo) had gotten in a fight with an inmate whom he suspected was ratting on him. Over time, Montalvo spoke about his New York to Buffalo drug activity (reportedly amounting to ten grand a week) and that he'd been pulled over with ten to fifteen ounces of cocaine in his vehicle.

They also had a conversation about the brothers who were killed. Montalvo said that he was at Sammy Loco's house and two guys (Cheko and Brandon) came over full of blood. (After refreshing his memory with a report of an earlier interview, Escalera said the other name mentioned by Montalvo was "Brandon." They stashed the guns and were talking about burning

their clothes and getting rid of the weapons. Montalvo also said that he was scared about getting indicted and mentioned that he'd been throwing out lies so people would mix things up and he'd see what came out in court.

Montalvo also told Escalera that he was "messing with one of their girls," and they got into an argument. The reason they were killed was for a lottery ticket worth $80,000.00. He also said that he was close friends and did business with Sammy Ortiz, Sr.

He added that Cheko and Brandon came over to Sammy's full of blood and said that they had killed somebody.

### Uda Hidalgo Grand Jury Grand Jury Appearance

Uda Hidalgo, who was ten months into a 25 year sentence on a manslaughter conviction for killing his girlfriend, testified pursuant to a proffer agreement on November 8, 2012. (At his state sentencing in Erie County Court on January 10, 2012, his counsel complained that two FBI agents and a Buffalo Police detective had visited his client without his knowledge the week before and promised to help him out with his case if he cooperated in the federal investigation. The state prosecutor stated that no one had authority to make such promises. The federal prosecutor informed defense counsel that he was not aware of nor did he sanction any promises to Mr. Hidalgo by the FBI).

Uda said that Cheko and Brandon had stolen Waldemar's AK-47 after he refused to sell it to them. They also had an SKS rifle that they had gotten from Cheko's friend, Paco. In November, 2004, Uda saw Cheko in front of Sammy Ortiz' house talking to a "fat Puerto Rican dude" about a "lick" that he had for Cheko where there would only be one person present. (Booking information from a 11/19/11 arrest of Misael Montalvo lists him as 5'6" and 225 lbs.).

-50-

A day or two later, Cheko invited Uda to join in and promised him a cut of $3,000.00 He said it would be an easy lick with an expected $90,000.00 haul along with a kilo of cocaine. Uda declined the offer because his cut was too light, so Brandon promised him a bigger piece. Uda was aware that another guy was supposed to be involved but he didn't know who it was. A couple of weeks later, Brandon asked him to borrow some duct tape.

On November 11, 2004, Uda was at Sammy Ortiz' house during the day but went home to watch wrestling (apparently very popular programming on the West side) in the evening. He learned from the TV news that two people had been killed in their house. He went to Sammy's house and saw Sammy, Sr., Efrain (Cheko), Brandon (B), Macho (Frank Matias) and the same fat Puerto Rican dude (Misael Montalvo) that he'd seen talking to Cheko about the lick a couple weeks earlier.

Efrain was arguing with the fat Puerto Rican exclaiming, "it was all a set up. There was only supposed to be one guy, not two." Cheko slammed him down on the table and Brandon picked up a butcher knife. Uda and Sammy stepped in and said, "chill" and Brandon who had blood on his pants and Nike sneakers said, "(h)e played us." Cheko said, "you sent me there (for nothing) to handle your dirty work." The fat dude said, "I didn't know, sorry." Sammy broke things up and Cheko said, "It's coming out of your pocket. I didn't go there for nothing." The fat dude said "I'll pay." At that point, Uda went home.

The following day, Uda spoke to Macho who said, "it wasn't supposed to down like that." He said that as soon as they broke the door down, Brandon shot the first guy. Macho and Cheko searched the house for drugs and money while Brandon kept watch on the first guy. He said that there was only supposed to be one guy and no one was supposed to get hurt. The

-51-

second guy came out with a gun and started shooting, so Brandon shot him. Macho said the guy had a chrome gun. Before shooting the second guy, Brandon said, "you want to get crazy, I can get crazy too," and opened fire. Macho then told him that they took off running down 7th Street and Brandon and Cheko threw the gun into a nearby bush. After that, they returned to Sammy's when Uda showed up.

Cheko later told Uda at their father's house that they had been set up by the dude who'd sent them there to do his dirty work. He said that there were no drugs or money and "stupid B" opened fire. He said it was a mistake to let him have the gun. Macho was the first to run out of the house.

Cheko also said that he forced open the door to the back room and encountered the dude with the gun who pointed it but it didn't go off. So, Cheko tried to whack at it with the bat. The dude cocked the gun, Cheko yelled for Brandon. The dude cut into a side room and opened fire and Brandon did so as well. He shot the dude several times saying, "if you wanna get crazy, I can get crazy too."

As they headed out, Brandon said to the first guy, "so we came for nothing." He replied, "yeah, nothing." Brandon then shot him in the back of the head and they took off running down 7th Street. They were passing the gun back and forth and Brandon, who was lagging behind, said "if you don't slow down, I'll start shooting in the street." They stuffed the gun in some bushes and ran to Sammy's. He said they later cut up the gun and got rid of it.

The next day, Uda told Brandon what Cheko had told him. Brandon said, "it wasn't like that." When they broke open the door, he yelled at the first guy to stay put. The guy spoke in Spanish but Brandon didn't understand him. The guy continued to come forward, reached

-52-

around the door frame and Brandon, thinking he might have a gun, shot him in the arm. He was bleeding a lot so Brandon gave him a blanket. He then heard Efrain scream, "he's got a gun." The second guy was pointing a gun and ducking behind a wall and opened fire. He came back out and fired two shots so Brandon stepped around the corner with the AK-47 and "let it rip." The guy slid down the wall. He mentioned that he could have run but Efrain is his blood and if he had left, Efrain would have died, "I saved his life."

On the way out, he put the gun to the first guy's head and said, "here for nada?" The guy said, "nada." Efrain said that "names" were mentioned (he called out to Brandon by name), "do what you gotta do," and "blam," Brandon shot the guy in the head. He said the AK-47 was a Russian military rifle that was stolen from Waldie's house (note CPS ballistics report). He described it as having a cherry frame and a 60 round banana clip. According to Uda, Brandon said he'd thrown out his clothes in someone's garbage can.

Uda testified that the Buffalo Police had picked him up for questioning on November 17, 2004. They told him that his name had been mentioned in connection with the double homicide. They showed him a photograph of the defendant and Uda said, "I've never seen him before." They also showed him a photo of Brandon whom he identified as his cousin. The cops said they wanted to talk to him but he said he wasn't sure where he was. He did say that he could get hold of Cheko.

Uda later spoke to Cheko at his father's house on Busti and informed him about his discussion with the police. He told him about the picture of the guy (defendant) that the police had shown him and Cheko asked if Uda had said anything. He said no. He also had not told the police about the robbery plan or the altercation at Sammy's house after the killings.

-53-

A couple of days later, Cheko apparently spoke to the police. Uda asked him, "why are they questioning me about something I wasn't involved in" and he said that he would find out. Uda figured that either Brandon or Macho had "put his name in there." He then spoke to a girl on Prospect, Francesca (Poncha) who said that Macho had implicated him along with Cheko and Brandon. Uda confronted Macho who said that Poncha was lying and if he did say anything, he must have been drunk or high on coke.

Uda then called Cheko and told him what Macho had said and instructed him to talk to Macho "because I'm not involved in that shit." Cheko then told Macho that he should leave town. Brandon told Macho that it was the best thing because "I'd hate to have to knock you off." Macho then said he'd go to New York City where his father was living.

Uda said he argued with Cheko about being implicated and Cheko said, "(Y)ou were involved no matter how you look at it (because) you gave us the duct tape." (Macho did not recall seeing any duct tape). Uda later heard from Sammy Ortiz, Jr. that some guy had gotten convicted for the killings. He spoke to Cheko and wondered why the guy would admit to such a thing. Cheko said he didn't know, "maybe Macho said he was drunk." Uda said, "that's fucked up," and Cheko replied, "that's not fucked up. He's the dummy that went in there and told them that he did it."

<u>Federal Indictment</u>

Misael Montalvo, Efrain Hidalgo, Brandon Jonas were indicted for the Camacho homicide on November 8, 2012. The following day, the Federal District Court signed an order authorizing release of the Grand Jury minutes to the District Attorney's Office. (A subsequent order granted release to the defendant's original counsel on March 7, 2013).

At a detention hearing for Montalvo before the Federal Magistrate on November 12, 2012, the prosecutor summarized the evidence against them and described the defendant's 2006 guilty plea as a "red herring" lacking in any physical evidence or eyewitness testimony to back it up. He pointed out that the defendant was suffering from a major mental illness when he confessed to the police and argued that the details that he provided had been obtained from Luis Camacho at the victims' wake.

Asserting that the defendant, based on their independent investigation had "zero role in this offense," the prosecutor expressed his hope that the District Attorney's Office would come to the same conclusion and pave the way to clear him without further litigation.

### Cecilio Medina Interview

FBI investigators interviewed Cecilio Medina pursuant to a proffer agreement. He stated that he hung out with Uda and Cheko Hidalgo since about 1999. Shortly after the Camacho homicides, Cheko showed up at his house. Medina asked, "did you do it," and Cheko said, "don't ask stupid questions." Later, in 2006, Cheko stated that he, Brandon and Macho had been told that the Camacho's had a significant amount of cocaine. Brandon had a "K" (AK-47) and Cheko had a bat. Cheko kicked in the door and Brandon immediately shot the first brother. They ran into the back of the house, the second brother pulled the trigger of his gun but it did not go off. Brandon shot and killed him. Macho started to get sick. They searched the house and only found a little money. Brandon gave the gun to Macho because he was small and fast (a booking form dated 6/8/11 listed him at 5'8" and 185 lbs.). They all ran out of the house and across the street. Cheko said there was a female hiding in the house who had seen all of their faces. He said that they had gone there looking for kilos of coke, money and firearms.

-55-

later in 2006, Brandon told Medina on 18th Street that when they kicked the door in, he saw the first brother reaching for something so he shot him. He then saw the second brother pointing a silver handgun at Cheko so he shot him as well (from the groin up). He said the victim looked "gory" and he had never seen anything like that before.

## Return to Tebo

Detective Evans re-interviewed Esteban "Tebo" Acevedo (now a federal probationer) at his house on December 19, 2012. He said that he had seen the three suspects before and after the killings. They knew him and he know Macho (his son's brother-in-law), the one (Cheko) whose brother (Uda) killed his girlfriend, and the third he really didn't know. Before the homicides, he had seen them on his home surveillance camera and asked why they were in front of his house. They said they were chilling and he told them to move on which they did.

Acevedo then rode around the corner, heard a shot and saw the three suspects running from the house. One had a long gun and the other threw a bat in his yard. Acevedo went into the house and a heavy set woman was screaming, "they killed them." He saw one brother on the floor with his face blown off and the other one was in the back. He told the woman that the cops would be coming soon and he left.

Acevedo's sons told him that Brandon was the shooter. He didn't know him but had seen him around. He said the "set up guy" was not there and the one who said he did it had nothing to do with it. He surmised that "he must've been doing drugs or something." He said that he was related to Reinaldo Velasquez who had since died. He said, "I should've said something before because I knew who did it. That was terrible." (Although he had spoken to Detective Wagstaff on the night of the murders, he had apparently refused to go to police headquarters to give a

formal statement).

He described the suspects as all being about 5'8" tall. (Detective Evans promised to inform the U.S. Attorney's Office of their interview).

Investigator Rondon and Detective Evans interviewed Acevedo yet again on December 27, 2012 at the U.S. Attorney's Office in the presence of his counsel. He said that the three suspects (Cheko, Macho and Brandon) outside of his house were all wearing hoodies. After he told them to leave, they proceeded south on Niagara and he took a ride to run errands around the block when he heard a shot followed by more shots. He headed back home and saw them leaving the house across the street. ("I saw Cheko and Macho and then Brandon came out last (with) a long gun (that)...he looked like he was trying to hide...by putting (it) to the side."). They ran past Acevedo's house and then down the street. He then heard someone crying outside the house and observed a lady (Luis Camacho's girlfriend), crying on the porch saying, "someone killed them."

Acevedo tried to calm her down and then went to the front door where he saw Nelson on the floor with his face blown away. He went back outside and told the lady that the police were on the way.

Acevedo also said that he had spoken to both Cheko and Macho who expressed their happiness that the defendant, whom he did not know, had taken the blame. They said they'd heard that he was "on drugs or something." These conversations reportedly had taken place in Acevedo's garage on Breckenridge Avenue where Cheko and Macho would bring cars to be fixed. They explained that "the guy was supposed to have a lot of money from hitting the lotto or something like that." Brandon entered the house with the gun, one of the victims looked like he

was reaching for something and Brandon shot him. Macho said they had been told the guys had money but they only found about $125.00 in a pair of pants.

The detective showed Acevedo photo arrays and he: 1) recognized Brandon saying, "(h)e looks familiar but I'm not sure," 2) identified Macho saying, "he's my son's brother-in-law," and 3) identified Cheko, "I know him and his father. His brother is the one who killed his girlfriend."

## The Defendant's Appeal

On December 21, 2012, the Fourth Department affirmed the defendant's conviction determining that the trial court complied with CPL 730 and properly found him fit to proceed. They also found that his motion to suppress statements (though un-preserved) was properly denied.

## Procedural History of this Motion

The defendant brought this motion on April 23, 2013. The People responded on July 12, 2013 and served a supplemental reply with attachments on July 16, 2013. The defendant then submitted a supplemental affidavit based on DNA lab reports dated 5/25/2012, 12/14/12 and 6/17/13 (received from the U.S. Attorney's Office on June 23, 2013) along with a reply to the People's opposition on July 17, 2013. The People submitted a supplemental opposing affidavit (based on DNA reports) on July 25, 2013. Oral argument was heard on July 29, 2013. The defense then provided an affidavit of Emily Trott, Esq. (defendant's counsel in the Federal Grand Jury) dated September 3, 2013 and another supplement to the original motion on October 17, 2013. The People submitted a response to the Trott affidavit on December 4, 2013.

On December 2, 2013, the People provided the court, per its request, with the State Grand Jury minutes, the BPD Homicide files and Evidence file regarding the crime scene. On

-58-

December 6, 2013, the U.S. Attorney's Office, in response to a request form the court, provided the court and counsel with various documents including: report of BPD interview with the defendant at Buffalo General Hospital on November 16, 2004, report of BPD interview with the defendant on November 16, 2004 at the homicide office, detectives notes of November 16, 2004 interview with the defendant, defendant's written statement of November 16, 2004, transcript of defendant's plea colloquy of March 22, 2006, report of interview of the defendant at Auburn Correctional Facility on June 29, 2011, report of interview of the defendant at the U.S. Attorney's Office on July 14, 2011, detectives notes regarding photo arrays shown to defendant on July 14, 2011, photo array including Brandon Jonas, photo array including Uda Hidalgo, photo array including Cheko Hidalgo, transcript of the defendant's July 14, 2011 Grand Jury testimony, defendant's immunity agreement of July 21, 2011, report of July 21, 2011 interview of the defendant at the U.S. Attorney's Office, transcript of the defendant's July 21, 2011 Grand Jury testimony, BPD report of July 11, 2012 interview with defendant at Attica Correctional Facility, BPD report of September 6, 2012 interview with the defendant at Attica Correctional Facility and transcript of the defendant's September 13, 2012 Grand Jury testimony.

Thereafter, in response to a further request from the court, the U.S. Attorney's Office provided the court and counsel with firearms and ballistics reports on December 20, 2013. On January 2, 2014, the court sent a letter to counsel inquiring whether the statements of Pedro Ramos Vega and Carlos Osorio (which were in the People's file provided to the court on December 2, 2013), had been provided to the defendant prior to his guilty plea. On January 9, 2014, defendant's counsel advised that he did not have possession of those statements at the time of the defendant's plea. On January 21, 2014, the People provided copies of the defendant's

discovery demands, omnibus motion and People's answering affidavit. As far as they could tell, the Vega and Osorio statements had not been handed over to the defense. The People deemed the statements to be Rosario material, not Brady material as there was "nothing inconsistent with the defendant's admissions and recitation of facts known only to the killers." They also took the position that even if the varying descriptions of individuals observed fleeing the scene were relevant to the defendant's involvement, this "goes to the issue of factual guilt which...was waived by his guilty plea." (People v. Day 150 AD 2d 595 [2nd dept. 1989]).

On January 21, 2014, the defendant submitted a supplemental affidavit arguing that the failure to turn over those statements constituted a Brady violation which deprived him of the opportunity for "effective use" of the information in deciding whether to plead guilty, and that this issue was not waived by his plea. (People v. Delarosa 48 AD 3d 1098 [4th dept. 2008], People v. Pelchat 62 NY 2d 97 [1993]).

### The Defendant's Arguments

The defendant argues, first, that the Federal Indictment and the testimony upon which it is based constitutes new, material, non-cumulative (and not merely impeaching) evidence discovered since his conviction which could not have been found with due diligence beforehand and which would, in all probability, result in a more favorable outcome. (CPL 440.10 (g), People v. Salemi 309 NY 208 [1955], People v. Tankleff 49 AD 3d 160 [2nd dept. 2007]).

He also contends that the DNA evidence which excludes him from the crime scene and from physical evidence connected with it creates a substantial probability of innocence (CPL 440.10 1 - g) notwithstanding his guilty plea which he describes as irrational and inconsistent with the crime scene, eyewitness descriptions of persons fleeing the house, and the accounts

provided by the actual perpetrators. In the defendant's view, the conviction is this case is precisely the kind of circumstance (guilty plea by a mentally ill person undertaken to avoid a harsher result) which prompted the legislature to amend the statute to permit innocent persons who have pled guilty to undo their convictions upon DNA evidence which exonerates them.

The defendant's overriding argument however, is that his conviction cannot stand on account of his actual innocence, and that his continued imprisonment violates his due process rights under CPL 440.10 (1) (h) (citing, inter alia, People v. Bermudez 23 Misc. 2d 1226 [Sup. Ct. NY County [2009], People v. Cole 1 Misc. 3d 531 [Sup. Ct. Kings County 2003], People v. Wheeler-Whichard 25 Misc. 3d 690 [Sup. Ct. Kings County 2009]).

### The People's Argument in Response

The People contend that the defendant's motion should be summarily denied because it is conclusively refuted by unquestionable documentary proof and record evidence of his guilt contained in his guilty plea in March, 2006 in County Court and sworn testimony in the Federal Grand Jury in 2011. (CPL 440.30 4 [c], [d]).

Regarding the defendant's claim of new evidence, the People point out that any such argument is entirely unavailable under CPL 440.10 (g) which, by its terms, applies only to convictions that are based upon "a verdict of guilty after trial." (See People v. Sides 242 AD 2d 750 [3rd dept. 1997], People v. Latella 112 AD 2d 321, 322 [2nd dept. 1985], "the power to grant...a new trial upon newly discovered evidence is purely statutory and such power may be exercised...only when the requirements of the statute have been satisfied."). They contend that the defendant's motion does not meet the Salemi test in any event.

With respect to the DNA evidence, the People argue that the absence of defendant's DNA

from a bat that he never even mentioned much less wielded and from a license whose connection to the case is unknown, hardly creates a substantial probability of his innocence. Moreover, in their view, the absence of Cheko Higalgo and Frank Matias' DNA from a bat which Matias claimed they both handled, casts serious doubt upon the veracity of his (Matias') testimony before the Federal Grand Jury. (None of the other federal defendants are implicated by DNA evidence).

As for the defendant's claim of actual innocence, the People contend that the defendant's sworn confession of guilt to the police on November 16, 2004, his sworn guilty plea on March 22, 2006 and his detailed sworn reiteration of guilt before the Federal Grand Jury on July 21, 2011 should not be upended by the suspect testimony of self-serving criminals and the defendant's belated 2012 recantation which, in the People's view, was orchestrated by a heavy-handed effort by federal prosecutors to remove a significant obstacle to the prosecution of Brandon Jonas, Efrain Hidalgo and Misael Montalvo.

<u>Analysis and Conclusion</u>

At oral argument, the prosecutor aptly described this case as a "hot mess." On the one hand, the defendant walked into the arms of law enforcement and, in a nascent psychotic, drug affected and sleep deprived state, confessed to two grisly murders of which he was not even suspected and to which there was no other evidence to connect him. His confession, though detailed as to matters of motive and modus operandi, is curiously incomplete (no clear identification of his co-conspirators or recognition of him by them, no mention of the bat reportedly used and recovered by the police), equivocal (who kicked the door in, who had what weapon) and demonstrably inaccurate (multiple guns including an AK-47, a .9 mm and shotgun

supposedly fired when ballistics only support an AK-47 or SKS; description of Flaco's handgun as "darker" than a cell phone when the gun found at the scene was chrome colored).

From a prosecutorial perspective, the defendant's confession was a dead end insofar as it appears to have furnished no useful leads or basis to prosecute anyone else for these killings. Right from the start, the police had reason to believe that three people were involved yet the state prosecution concluded, for all intents and purposes, with his guilty plea.

While the state prosecutors urge that the defendant's guilty plea be upheld, federal prosecutor's insist upon his innocense based, in large measure, upon the testimony of cooperating criminals. They argued in Federal Court that far too many details (e.g. car used, people involved, weapons fired) cast too much doubt on the defendant's confession while the People contend that the defendant's guilt can be gleaned from the very details (e.g. statement of motive, TV on, attempted removal of victim's chain, location of victims, description of victim on cell phone, and where victims were shot) which, in their estimation, only an actual participant would have known.

For his part, the defendant argues that the details that he gave came from Luis Camacho at the funeral and from talk on the street. Moreover, those details that Luis could not have known due to his arrival after the fact, were, coincidentally, not mentioned by him.

While the defendant's detailed account may be explained by exposure to outside sources, more difficult to comprehend is his sworn reiteration of guilt before the Federal Grand Jury in July, 2011. His counsel argues that he maintained his false claim of complicity because he trusted no one and feared that he would be implicated in a federal drug prosecution. He was savvy enough, however, to stop answering questions in the Grand Jury until he was assigned an

attorney and granted a written immunity agreement. He was also advised on the record that he would not be prosecuted for anything he might say so long as he gave truthful testimony.

Also unclear to this court is why federal prosecutors, if they believed in the defendant's actual innocence, would have put him in the Grand Jury when they knew from earlier debriefings of him by their investigators, that he continued to claim involvement in the homicides. Even more perplexing is why they would not tell the defendant's lawyer (who would not have even been involved had the defendant not requested counsel), that they were investigating, among other things, the very crime to which this defendant had pled guilty five years earlier. Moreover, it was only after the defendant would not or could not identify the other suspected co-conspirators (Uda and Cheko) that he was shown the door and reminded of the risks of perjury.

Then, a year later, after being informed, apparently for the first time, that federal prosecutors believed him to be innocent, and, believing that there was DNA evidence that exonerated him, the defendant was now willing to go on the record and proclaim his innocence. Although, at the prosecutor's suggestion, he claimed to have lied in 2011 about his involvement because he figured he'd still have to serve out his state sentence no matter what he said, the more plausible explanation, as he also suggested, was that he really didn't have one.

It could also be that he truly feared some type of harm from others, real or imagined, or that he now felt that by testifying, he would only be clearing himself rather than implicating others. While not entirely logical, it is no more or less logical than claiming out of the blue to have knowledge about murders (only to tell the police nothing of value one day), and then seeking out police the next day and claiming to have been involved.

Perhaps, as defense counsel suggests, the defendant's confession and reaffirmation of

-64-

guilt before the Grand Jury can only be explained by the fact of the defendant's mental illness. Or perhaps, as the People suggest, it can be explained by his involvement in the crimes to which he confessed with no scarcity of detail.

What has concerned this court from the start, however, is that several people observed three suspects fleeing the scene, none of whom even remotely fit the defendant's physical characteristics. The day after the murders, Frank Coppola described seeing three males, all about six feet tall, wearing dark hoodies, run by him northbound on Niagara Street toward Massachusetts. Coppola described them in the Grand Jury as appearing to be Hispanic and of average height and build.

On November 13, 2004, Pedro Vega described the suspects as young looking, light skinned males in dark hoodies (one carrying a large gun), ranging in height from 5'8" to 5'11" or more. His friend, Carlos Osorio described them as being short, young and Puerto Rican/black and wearing dark hoodies. He also noticed Esteban Acevedo ride up to the scene after the fact on his bicycle.

For his part, Acevedo told detectives that he had seen three guys (two in dark hoodies and one in a gray hoodie) carrying something. In 2012, he said that he had seen and confronted three individuals (Macho, Cheko and Brandon) hanging out in front of his house at 53 Massachusetts just before the shootings. He then rode his bike around the corner and saw them (one with a long gun and another with a bat), running from the house. He described them all as being in the 5'8" range.

Carmelo Mercado told police that he saw three medium built, Spanish looking dudes (two in black or blue hoodies and one in a gray hoodie), in the range of 5'5" to 5'6" tall. The one in the

gray hoodie was coming out of the walkway at 53 Massachusetts (where the bat was found).

Beverly Laborgne observed three guys wearing baggy clothes and hoodies run out the front door, one after the other. The last one out was carrying a rifle lengthwise by his leg. She saw them run across Niagara toward Massachusetts. While her testimony corresponds, to some degree, with the defendant's description of his clothing and manner of carrying the gun, conspicuously absent from her testimony is any description of shapes or sizes of the suspects. It would seem that the defendant's 6'5", 350 pound presence would not have gone entirely unnoticed.

Luis Camacho claimed only to have seen two skinny, smallish suspects in hoodies running across the street toward Massachusetts. The People argue that he didn't see the much larger defendant (whom he knew) because the defendant, by his own admission, split off from the others. However, several witnesses, as noted above, observed three suspects, none of whom matched the defendant, run in the same direction towards Massachusetts. (While the People suggest that someone may have run out of the back door, there has never been any indication that more than three suspects entered the home). It also doesn't make sense that the defendant would describe the other suspects as running back toward the car (which he said had been parked on 7th Street) when three suspects were seen running together toward Massachusetts.

The People also argue that the "fat Puerto Rican dude" observed by Uda speaking to Cheko outside Sammy Loco's house about the "lick" could have been the defendant. This is belied, however, by Uda's Grand Jury testimony which clearly points to Misael Montalvo who not only fits this description but was threatened by Cheko and Brandon at Sammy's house (where Montalvo admitted he went) after the killings for setting them up to do his dirty work. (Frank

Matias' testimony also supports this scenario and Montalvo's admissions to different jail house informants tends to confirm his culpability as the one who put the others up to hit the Camacho home on the promise of a big pay day after they (Camacho's) exiled him from their drug operation).

It is also not insignificant that none of those implicated in the federal indictment (Cheko Hidalgo, Brandon Jonas, Misael Montalvo) or those who have cooperated in their prosecution (Uda Hidalgo, Frank Matias) claimed even to know of the defendant before he came in off the street and, to their astonishment, claimed responsibility for these killings. And, as noted above, although the defendant did implicate Uda by name, he did not identify his photograph (nor could Uda identify him) and, though not admissible at a trial, Uda reportedly passed a polygraph examination wherein he denied involvement in the homicides.

This court agrees with the People that there is no basis for relief under CPL 440.10 (g) inasmuch as the defendant's conviction derives from a guilty plea rather than a verdict after trial. (People v. Sides supra; People v. Latella supra).

This court also agrees that while the DNA evidence is somewhat helpful to the defendant's case, it is hardly dispositive because it does not create a substantial probability of innocence. (CPL 440.10 [g-1]). While the People consider the absence of the defendant's DNA from the bat to be a red herring, it is of no particular significance one way or the other since there is no claim that he ever touched it. What is significant, however, is that the defendant never even mentioned the bat when it seems pretty clear that it was carried into the house, brought out and discarded in the yard at 53 Massachusetts. It is curious that the defendant would mention multiple weapons (shotgun, .9 mm handgun) that had no demonstrable connection to the case yet

-67-

say nothing about a weapon that was involved.

The presence of both victims' DNA on the bat is unexplained inasmuch as no one claims that either of them touched it or were struck by it. Cheko reportedly wielded it to discourage Miguel from shooting his gun but there is no testimony that he actually hit him with it. Whether their DNA got there from secondary transference or otherwise is unknown.

The absence of Brandon's DNA from the bat is not particularly surprising since no one claims he touched it and, as for Cheko, the lack of his DNA on the bat could be explained by the fact that he wore gloves. The absence of Macho's DNA is problematic since he claims to have handled the bat (with no claim of wearing gloves), while Cheko was crashing in the front door. Whether this means that Macho was lying about handling the bat or can be explained scientifically is unclear.

What seems reasonably clear, though, is that the bat, as noted above, was involved and discarded by one of the fleeing suspects. Moreover, Macho's detailed testimony about the meeting at Sammy Loco's with Cheko, Brandon and Montalvo, the drop off by Montalvo in the yellow car, the clothing they wore (gray and black hoodies), Montalvo's claim about significant amounts of cash and drugs in the house, the confrontation with Esteban Acevedo, entering the home behind Brandon (with the AK-47) and Cheko (with the bat), grabbing a necklace from one of the victims, Brandon shooting the first victim in the arm, the second victim possessing a silver handgun, Brandon shooting the second victim, "bouncing him off the wall until he slid to the floor," hearing a shot as he reached the curb, running towards Massachusetts to Columbus Parkway, Brandon still carrying the gun and Cheko no longer with the bat, Brandon tossing the gun into the bushes, returning to Sammy's home where Brandon and Cheko threatened to kill

Montalvo for setting them up, Germick Catalan telling Macho he already know what had happened from his father (Esteban Acevedo), the subsequent threats by Cheko, Uda's reporting that he had been questioned by the police, hearing that the defendant, whom he did not know or recognize, had taken the fall to the delight of Cheko who described him as "dumb for admitting something like that," cannot simply be dismissed out of hand for lack of his DNA on the bat.

Turning to the defendant's claim of actual innocense, while a number of trial courts have concluded that the New York State constitution provides a procedural mechanism for an incarcerated defendant to bring a post-conviction motion to vacate under CPL 440.10 (h) upon a so-called free standing claim of innocense (see for example, People v. Bermudez 25 Misc. 3d 1126A [Sup. Ct. NY County 2011], People v. Cole 1 Misc. 3d 531 [Sup. Ct. Kings County 2003]), it was not until just recently that an appellate court answered the question in the affirmative. In People v. Hamilton NYS 2d WL128496 Slip. Op. 00238 (2ⁿᵈ dept. 2014), the Second Department held that a free standing claim of innocense is indeed cognizable under CPL 440.10 (h). The court noted that such claim is based upon an acknowledgment that an innocent person has a "liberty interest in remaining free from punishment" and should not be incarcerated for a crime he did not commit (citing People v. Tankleff supra and People v. Cole supra).

The court also noted that a defendant advancing a claim of actual innocence, whether or not upon newly discovered evidence, bears the burden of establishing his innocence by clear and convincing evidence. However, as the People point out in their submission of January 26, 2014, "mere doubt as to the defendant's guilt or a preponderance of conflicting evidence as to the defendant's guilt is insufficient, since a convicted defendant no longer enjoys the presumption of innocense, and, if fact, is presumed to be guilty." (Id. At p. 9).

-69-

In Hamilton, the court determined, based on evidence of a credible alibi (not considered by the trial court in an earlier 440 motion), "indications of witness intimidation and recantation, that the defendant had made a sufficient showing of possible merit to warrant a further a further exploration" and remanded the case for a hearing.

With respect to other suspects, it appears from the People's discovery response of February 18, 2005, that the defense was provided with several police reports including, inter alia, Detective Wagstaff's P-73 of November 11, 2004 which mentions an interview of Steven Acevedo (with no size description); an interview of Carmelo Mercado (describing the fleeing suspects as 5' 5" to 5' 6" tall); Detective Gugliuzza's P-73 of November 11, 2004, in which she mentions speaking to the upstairs residents (Beverly and David Laborgne); Detective Cook's P-73 of November 12, 2004, referencing an anonymous tip implicating "Brandon, Cheko and Uda;" Detective Bursie's P-73 report of November 13, 2004, referencing information relayed to Officer Montalvo from an arrestee who named a West side gang banger with an AK-47; Detective Root's P-73 of November 12 and November 13, 2004, referencing information relayed by an informant to Officer Garcia that the victims had an altercation outside of Zip's with a Hispanic teenager who then recruited two black males to commit the homicide with him; community information from Officer Quintana that a Puerto Rican named "Tawa" may have been involved, reference to a "self explanatory" statement taken from Carlos Osorio on November 12, 2004. (Neither the statement itself nor a report of Detective Judge's November 15, 2004 follow-up interview with Osorio, who now described the fleeing suspects as dark skinned Hispanic males, all about 5' 7" tall, appear to have been provided. The Vega statement was also not disclosed).

The People note that the defendant had not (prior to receiving copies of the Osorio and

Vega statements from the court), raised any Brady claims which, in their view, go to the issue of factual guilt which they contend is waived by his guilty plea. (Citing People v. Day 150 AD 2d 595 [2nd dept. 1989], People v. Knickerbocker 203 AD 2d 753 [2nd dept. 1996]).

The People also argue that such information constitutes, at most, the type of conflicting evidence that does not rise to the level of warranting relief under CPL 440.10 1 (h) (People v. Hamilton supra). In the People's view, the defendant's guilty plea to lesser charges upon the advice of experienced counsel was not tainted by any non-disclosure and should mark the end of the case rather than a gateway to further litigation. (People v. Taylor 65 NY 2d 1 [1985]). It should be noted, however, that in the context of a free standing claim of innocense under CPL 440.10 (1) (h), "actual innocense means factual innocense" (People v. Hamilton supra at p. 6), and new evidence may be considered whether or not it meets the Salemi factors under CPL 440.10 (1) (g). (Id at p. 12). Moreover, as noted in People v. Delarosa 48 AD 3d 1098 (4th dept. 2008), Brady material must be disclosed in time for its effective use at trial or at a plea proceeding. Nor is it waived by a guilty plea. (People v. Pelchat 62 NY 2d 97 [1993]).

In this court's view, evidence from multiple witnesses describing three suspects fleeing from the scene, none of whom match the defendant's physical appearance (when considered in light of other evidence excluding him altogether), is not nearly as extraneous or irrelevant as the People suggest. This is especially so where the only evidence of guilt was a detailed but divergent confession of a mentally ill individual who was experiencing an apparent psychotic break from reality.

In People v. Campbell 8 AD 3d 1257 (4th dept. 2011), the court held that it was error not to hold a hearing where the defendant (who had pled guilty to Murder 2nd degree) raised an issue

-71-

of fact that his trial counsel was aware of but did not advise him of potentially exculpatory evidence consisting of information from an inmate who advised prosecutors about a plot by others, not including the defendant, to murder the victim. Also, in People v. Deacon 96 AD 3d 965, 969 (2nd dept. 2012), the court, while not reaching the defendant's free standing claim of innocence, held that it was error for the trial court not to grant a new trial when the cumulative effect of newly discovered evidence (including a recantation by a witness who initially described the perpetrator as being 19 years old and 5'7" tall when the defendant was 34 years old and 6 foot tall) established a reasonable probability of a more favorable outcome.

In sum then, in order to prevail on a free standing claim of innocense, the defendant must establish his innocense by clear and convincing evidence, including all reliable evidence, whether or not it is admissible at trial due to some procedural bar (Hamilton supra at p. 9). (See People v. Cole supra, People v. Bozella 25 Misc. 1215 (A) [Dutchess County Court 2009], failure to turn over police report containing victim description of assailant fitting someone other than the defendant warranted a new trial). As noted in Caruso v. Russell P. Lefrois Building Co. 217 AD 2d 256 (4th dept. 1995), proof by clear and convincing evidence is proof that creates a high probability or reasonable certainty that a party's claim represents what actually happened.

Here, while the defense's explanation for the defendant's reiteration of guilt before the 2011 Federal Grand Jury is difficult to reconcile, the court finds that the totality of evidence including sworn testimony before the Federal Grand Jury, the multiple eyewitnesses who observed three fleeing suspects not matching the defendant, the inconsistencies in and omissions from his confession, apparently made while under the influence of mental illness, provides a sufficient showing of possible merit to warrant a fuller exploration. (People v. Hamilton supra,

-72-

see also <u>People v. Crimmins</u> 222 AD 2d 1055, 1057 [4th dept. 1995], a hearing should be held to promote justice if the issues raised by the motion are sufficiently unusual and suggest a searching investigation).

Accordingly, the defendant is hereby granted a hearing to determine whether his claims can be supported by clear and convincing evidence.

This decision shall constitute the order of the court.

Thomas P. Franczyk
Erie County Court Judge

dated:    FEB 0 7 2014

# GRANTED

FEB 0 7 2014

BY _Kimberly King_

KIMBERLY KING
COURT CLERK

-73-