UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

JOSUE ORTIZ,

                    Plaintiff,                          **DECISION AND ORDER**

          v.                                            1:16-CV-00321 EAW

MARK STAMBACH,

                    Defendant.

---

## INTRODUCTION

Plaintiff Josue Ortiz ("Plaintiff") sued defendant Mark Stambach ("Defendant") for violations of his civil rights related to his arrest and conviction for the murders of Nelson and Miguel Camacho, and his subsequent exoneration. (Dkt. 1). A jury found in Plaintiff's favor after a five-day trial, and awarded $5 million in compensatory damages and $1.5 million in punitive damages. (Dkt. 158).

Currently pending before the Court are several post-trial motions: (1) a motion for attorneys' fees filed by Plaintiff (Dkt. 167); (2) a motion for attorneys' fees filed by Plaintiff's former counsel, Hancock Estabrook LLP ("Hancock") (represented here by Alan Pierce, Esq.) (Dkt. 169); and (3) motions for judgment as a matter of law pursuant to Fed. R. Civ. P. 50(b), for a new trial pursuant to Fed. R. Civ. P. 59(a), and for remittitur pursuant to Fed R. Civ. P. 59(e) filed by Defendant (Dkt. 177). For the reasons that follow, the

- 1 -

Court denies Defendant's motions, grants in part and denies in part Plaintiff's motion for attorneys' fees, and grants in part and denies in part Hancock's motion for attorneys' fees.

## BACKGROUND

Familiarity with the prior history of this case—including particularly the Court's Decision and Order entered on February 26, 2021 (Dkt. 82), and the evidence adduced at trial—is assumed for purposes of the instant Decision and Order.   The Court has summarized the salient procedural background below.

Plaintiff commenced the instant action on April 26, 2015.  (Dkt. 1).  Following discovery and motion practice, the only claims that proceeded to trial were Plaintiff's claims against Defendant for malicious prosecution, fabrication of evidence, and violation of the right against self-incrimination.  (*See* Dkt. 82 at 36; Dkt. 160).   The jury found in Plaintiff's favor on each of these claims.  (Dkt. 160).

Following entry of judgment, Plaintiff filed his motion for attorneys' fees on May 20, 2022.  (Dkt. 167).  This motion did not include a request for any fees by Hancock, which had been terminated by Plaintiff on the eve of trial.  (*See* Dkt. 140).  Hancock filed its separate request for attorneys' fees on May 23, 2022.  (Dkt. 169).  Defendant filed his motion for judgment as a matter of law, for a new trial, and for remittitur on June 7, 2022.  (Dkt. 177).

On June 10, 2022, Defendant filed his opposition to both of the pending motions for attorneys' fees.  (Dkt. 179; Dkt. 180).  Hancock filed reply papers on June 21, 2022.  (Dkt. 182).

Plaintiff filed his opposition to Defendant's post-trial motions on June 28, 2022. (Dkt. 187).  Defendant filed his reply on July 8, 2022.  (Dkt. 192).  The Court heard oral argument on January 31, 2023, and reserved decision.  (Dkt. 194).

## DISCUSSION

## I.   Defendant's Post-Trial Motions

Because Plaintiff's entitlement to attorneys' fees turns on his status as a prevailing party, the Court considers first Defendant's challenges to the trial and the jury's verdict.

### A.   Motion for Judgment as a Matter of Law

Pursuant to Rule 50, the Court may grant a motion for judgment as a matter of law in a jury trial if it finds "that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party" opposing the request.  Fed. R. Civ. P. 50(a).  The same standard applies where, as here, a party renews its request for judgment as a matter of law after the trial is complete.  *See* Fed. R. Civ. P. 50(b).

"In ruling on a motion for judgment as a matter of law, the court may not itself weigh credibility or otherwise consider the weight of the evidence; rather, it must defer to the credibility assessments that may have been made by the jury and the reasonable factual inferences that may have been drawn by the jury."  *Williams v. Cnty. of Westchester*, 171

F.3d 98, 101 (2d Cir. 1999); *see also Stevens v. Rite Aid Corp.*, 851 F.3d 224, 228 (2d Cir. 2017) ("Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in his favor." (citation and alteration omitted)).  Accordingly, the Court may not grant judgment as a matter of law unless "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." *Williams*, 171 F.3d at 101 (alterations omitted and quoting *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers,* 34 F.3d 1148, 1154 (2d Cir. 1994)); *see also Wierzbic v. Howard*, 331 F.R.D. 32, 45 (W.D.N.Y. 2019) ("In ruling on a motion for judgment as a matter of law, the motion will be granted only if (1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against him." (quotation and alteration omitted)), *aff'd*, 836 F. App'x 31 (2d Cir. 2020).  This "standard places a particularly heavy burden on the movant where, as here, the jury has deliberated in the case and actually returned its verdict in favor of the non-movant." *Morse v. Fusto*, 804 F.3d 538, 546 (2d Cir. 2015) (quotations omitted).

Defendant contends that a reasonable jury could not have found for Plaintiff on any of the three causes of action that were presented at trial.  The Court disagrees, for the reasons that follow.

### 1.   **Malicious Prosecution**

The Court turns first to Plaintiff's claim for malicious prosecution.  "To prevail on a claim of malicious prosecution, four elements must be shown: (1) the defendant initiated a prosecution against plaintiff, (2) without probable cause to believe the proceeding can succeed, (3) the proceeding was begun with malice and, (4) the matter terminated in plaintiff's favor." *Ricciuti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 130 (2d Cir. 1997).  "The existence of probable cause is a complete defense to a claim of malicious prosecution . . ., and indictment by a grand jury creates a presumption of probable cause." *Manganiello v. City of New York*, 612 F.3d 149, 161-62 (2d Cir. 2010) (quotations and citation omitted). This presumption "may be rebutted only by evidence that the indictment was procured by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *Id*. at 162 (quotation omitted).

Defendant argues that the evidence at trial was insufficient to permit a reasonable jury to find that the presumption of probable cause had been rebutted in this case.[1]  In particular, Defendant argues that there was "no evidence, direct or circumstantial, of bad

---

[1]    It is undisputed that Plaintiff was indicted by a grand jury and that there was correspondingly a presumption of probable cause.

faith" on his part. (Dkt. 177-4 at 18).  However, Defendant ignores key evidence presented

at trial, and improperly construes the facts in a manner favorable to his position.

More particularly, Defendant ignores or downplays the following critical evidence

presented to the jury: (1) it is undisputed that Plaintiff was not involved in the murders of

the Camacho brothers; (2) Dr. Evelyn Coggins testified that Plaintiff was "in the throes of

a psychotic episode" during the relevant time period (Dkt. 157 at 45-47); (3) Plaintiff

testified that he spoke very limited English at the relevant time period (Dkt. 173 at 25-26);

(4) Defendant testified, and record evidence corroborated, that he was alone with Plaintiff

for approximately 40 minutes prior to Plaintiff giving his confession, during which time he

spoke to Plaintiff about the crime without advising him of his *Miranda* rights (Dkt. 165 at

18-19, 39-42); (5) Officer Edwin Torres, who had participated in an interview of Plaintiff

at Buffalo General Hospital the day prior to his interview with Defendant[2], testified that

Plaintiff was determined at that time not to have any credible information about the

murders (Dkt. 176 at 30-32); (6) Officer Torres testified that Defendant's notes from his

conversation with Plaintiff during the time that Plaintiff and Defendant were alone

contained "details that would only be known by somebody who committed the crimes" (*id*.

at 81); and (7) Officer Torres testified that those same details from Defendant's notes and

---

[2]     At the time of trial, Officer Torres was unable to recall whether Defendant was present during the interview of Plaintiff at Buffalo General Hospital.  (Dkt. 176 at 18). However, Officer Torres was impeached at trial with testimony he provided at the state court proceeding in 2005, identifying Defendant as being present during Plaintiff's interview at the hospital.  (*Id*. at 18-23).

which would only have been known to the perpetrator were repeated by Plaintiff in his confession (*id.*).

Distilled to its essence, Defendant's argument is that this circumstantial evidence is insufficient because Plaintiff was unable to remember his interaction with Defendant and provide direct eyewitness testimony to contradict Defendant's account.   However, Defendant has cited no authority holding that direct evidence is required to rebut a presumption of probable cause in a jury trial on a malicious prosecution claim.   Defense counsel did point at oral argument to certain reported decisions in which such direct evidence was presented, but the fact that other plaintiffs in other, unrelated cases were able to present stronger evidence does not render the jury's verdict in this case unreasonable. To the contrary, it is well established that—even in the more demanding criminal context— "the jury's verdict may be based entirely on circumstantial evidence, and may be inferred from the evidence, so long as the inference is reasonable, for it is the task of the jury, not the court, to choose among competing inferences." *United States v. Morgan*, 385 F.3d 196, 204 (2d Cir. 2004) (quotations and citations omitted).

In this case, while it is certainly not the only conclusion a jury could have drawn, it is a reasonable inference from the circumstantial evidence set forth above that Defendant deliberately fed Plaintiff information regarding the murders of the Camacho brothers during the 40-minute period they were alone, relying on Plaintiff's fragile mental state and limited command of the English language to manufacture a false confession, which

Plaintiff then repeated in front of Officer Torres as a direct result of Defendant's conduct. While defense counsel contended at oral argument that Plaintiff might have somehow been aware of the particulars of the murders despite not having been involved therein, the jury was not obliged to engage in that kind of speculation. Indeed, other than general references to Plaintiff having been associated with the Camacho brothers at the time of their murders, there was no other evidence presented at trial as to how Plaintiff, who was not at the crime scene, was able to provide accurate details regarding the murders in his confession. And, as previously noted, the day before Defendant interviewed Plaintiff, Plaintiff had been interviewed at the hospital by Buffalo Police Department detectives and had been determined not to be a suspect because he lacked any credible information regarding the crimes.

"[A] police officer's fabrication and forwarding to prosecutors of known false evidence" is the sort of bad faith misconduct that can rebut the presumption of probable cause flowing from a grand jury indictment. *Manganiello*, 612 F.3d at 162. Accordingly, a reasonable jury could have concluded, on the evidence presented at trial, that Defendant acted in bad faith and that the presumption of probable cause was accordingly overcome.

Defendant's arguments to the contrary miss the mark. As previously noted, Defendant relies heavily on the fact that Plaintiff himself is unable to remember his interaction with Defendant, and was accordingly unable to offer his own version of what happened during their 40-minute, pre-written confession interaction. According to

- 8 -

Defendant, this dooms Plaintiff's malicious prosecution claim, because he cannot satisfy "the 'competing testimony plus' test announced in *Boyd v. City of New York*[, 336 F.3d 72 (2d Cir. 2003).]" (Dkt. 177-4). Defendant overstates the holding in *Boyd*. There, the Second Circuit found, at the summary judgment stage, that "a jury could reasonably find that the indictment was secured through bad faith or perjury" based on the plaintiff's testimony as corroborated by a booking shoot. 336 F.3d at 77. Defendant reads this case to mean that the <u>only</u> way a plaintiff claiming malicious prosecution can demonstrate bad faith is through a combination of his own contradictory version of events and some corroborating evidence. (*See* Dkt. 192 at 9). However, while the *Boyd* court found that the evidence in that case was sufficient to create a triable issue of fact, it did not suggest that a plaintiff could never prove bad faith in some other fashion.

In other words, while *Boyd* and its progeny indicate that a plaintiff may not rely solely on "his version of events" to rebut the presumption of probable cause, *Peterson v. Regina*, 935 F. Supp. 2d 628, 643 (S.D.N.Y. 2013) (citation omitted), they do not establish that a plaintiff who cannot remember his interaction with the defendant can never prevail on a malicious prosecution claim. To the contrary, the situation presented here is essentially the opposite of what courts have found prohibited by *Boyd*—that is, rather than relying solely on his own version of events without corroborating evidence, Plaintiff relies on circumstantial corroborating evidence but is unable to offer his own eyewitness account.

This simply does not implicate the same prudential concerns as allowing the presumption to be overcome based solely on self-serving testimony.

Further, the jury was not required to find Defendant's version of events credible simply because Plaintiff was unable to offer his own recollection. *See In re Dana Corp*., 574 F.3d 129, 152 (2d Cir. 2009) ("a jury is free to believe part and disbelieve part of any witness's testimony"); *Dillon v. Morano*, 497 F.3d 247, 253 (2d Cir. 2007) ("A jury is under no obligation to find [a defendant] credible or find [his] explanation believable."). The jury could, and plainly did, conclude that Defendant was not being truthful about what happened during the time that he and Plaintiff were alone.  On a motion for judgment as a matter of law, the Court "cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury." *Tolbert v. Queens Coll.,* 242 F.3d 58, 70 (2d Cir. 2001) (quoting *Smith v. Lightning Bolt Prods., Inc.,* 861 F.2d 363, 367 (2d Cir. 1988)).

It is further not dispositive that certain evidence cited by the Court in denying Defendant's motion for summary judgment on Plaintiff's malicious prosecution claim was not ultimately introduced at trial.  Defendant argues that "this Court's summary judgment decision required that certain evidence had to be introduced showing that [Defendant] knew that [Plaintiff] was not or could not have been a perpetrator at the time of the confession."  (Dkt. 177-4 at 21).  Defendant's argument misunderstands the task that a court undertakes in deciding whether summary judgment in favor of a defendant is

appropriate. In assessing such a motion, a court need not analyze or articulate every legal or factual theory on which the plaintiff could potentially prevail at trial. If the court is satisfied that at least one material factual dispute exists, summary judgment must be denied. *See, e.g., Bonnie & Co. Fashions v. Bankers Tr. Co.*, 170 F.R.D. 111, 121 (S.D.N.Y. 1997) ("[I]t is basic, black-letter law that the existence of even one disputed issue of material fact renders a grant of summary judgment inappropriate. . . . Once this Court found that there existed one material issue of disputed fact regarding Count One, this Court did not need to consider any of [the defendant's] other alleged violations of the Factoring Agreement in order to deny summary judgment, and therefore, did not consider them. . . . As a result, *all* of [the defendant's] conduct which was alleged by plaintiffs in Count One to violate the Factoring Agreement survived [the defendant's] summary judgment motion.").

Consistent with these principles, in its Decision and Order denying Defendant summary judgment on Plaintiff's malicious prosecution claim, the Court identified certain evidence that it found would allow a reasonable factfinder to conclude that Defendant had knowingly procured a false confession from Plaintiff and accordingly denied summary judgment. (Dkt. 82 at 28). The Court never held that some lesser quantum of evidence would be insufficient to sustain Plaintiff's burden of proof at trial, because it was not called upon to make such a determination at that time. Nor did the Court grant partial summary judgment determining that any particular legal or factual theory of Plaintiff's as to this claim failed as a matter of law. Accordingly, the fact that the evidence at trial did not line

up precisely with the discussion in the Court's prior Decision and Order does not mean that Defendant is entitled to judgment in his favor.

For all these reasons, the Court cannot conclude that a reasonable jury would have been unable to find in Plaintiff's favor on his malicious prosecution claim, and Defendant's motion for judgment as a matter of law thereon is denied.

## 2.   <u>Fabrication of Evidence</u>

The elements of a fabrication of evidence claim are that "an (1) investigating official (2) fabricates information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). A plaintiff "may rely on circumstantial evidence (and reasonable inferences drawn from such evidence)" to support a contention that a defendant engaged in the fabrication of evidence. *Anilao v. Spota*, 340 F. Supp. 3d 224, 251 (E.D.N.Y. 2018), *aff'd*, 27 F.4th 855 (2d Cir. 2022).

Defendant argues that Plaintiff's fabrication of evidence claim is insufficient as a matter of law because "[t]here is no evidence whatsoever that [Plaintiff's] written confession is not an accurate account of what [Plaintiff] said to [Defendant] on November 16, 2004." (Dkt. 177-4 at 16). This argument fails for essentially the same reasons discussed above with respect to Plaintiff's malicious prosecution claim. Specifically, based on the evidence previously set forth, a reasonably jury could have concluded that

- 12 -

Defendant created a false confession by providing Plaintiff, who was suffering from a psychotic episode, with the details of the murders and causing him to repeat those details in response to Defendant's subsequent questions.  Having reached such a conclusion, a reasonable jury could further have found in Plaintiff's favor on his fabrication of evidence claim.   The Court accordingly denies Defendant's Rule 50(b) motion as to this claim.

### 3.    <u>Violation of Right Against Self-Incrimination</u>

A plaintiff may recover "under the Fifth Amendment self-incrimination clause if coercion was applied to obtain a waiver of the plaintiffs' rights against self-incrimination and/or to obtain inculpatory statements, and the statements thereby obtained were used against the plaintiff[] in a criminal proceeding." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998).  Whether a statement was obtained by coercion is determined by the totality of the circumstances.  *Id.*; *see also Green v. Scully*, 850 F.2d 894, 901 (2d Cir. 1988) ("No single criterion controls whether an accused's confession is voluntary: whether a confession was obtained by coercion is determined only after careful evaluation of the totality of the surrounding circumstances.").  "[F]actors to be considered include: the characteristics of the accused, such as his experience, background, and education; the conditions of the interrogation; and the conduct of law enforcement officials, notably, whether there was physical abuse, the period of restraint in handcuffs, and use of psychologically coercive tactics." *Nelson v. Walker*, 121 F.3d 828, 833 (2d Cir. 1997). "Psychologically coercive tactics" may include "techniques such as brainwashing or

promises of leniency or other benefits."  *Green*, 850 F.2d at 902; *see also United States v. Anderson*, 929 F.2d 96, 100 (2d Cir. 1991) (affirmative misrepresentations or improper "trickery" can render a confession involuntary (alteration omitted)).

Although it is a closer question than those presented by Plaintiff's other claims, the Court finds that the jury could have reasonably concluded that Defendant engaged in coercive conduct during the 40 minutes that he was alone with Plaintiff prior to the taking of Plaintiff's written confession.  In particular, the jury could have taken into account Plaintiff's limited understanding of English, Plaintiff's psychological state, and the fact that Plaintiff had a limited education.  (*See* Dkt. 173 at 23-24 (Plaintiff testifying that he only completed the 11th grade and had been unsuccessful in obtaining his GED)).  The jury also could have reasonably inferred that Defendant employed a psychologically coercive interrogation technique and/or engaged in improper trickery, based on the evidence that: (1) Plaintiff had no credible information about the murders when interviewed by law enforcement the previous day; (2) Plaintiff had no involvement in the murders; (3) during the 40-minute interval where he was alone with Plaintiff, Defendant created notes that included details of the murders that could only have been known by someone with inside knowledge; and (4) those same details were then repeated by Plaintiff during his answers to Defendant's questions during the creation of his written confession.

Defendant's emphasis on the law enforcement witnesses' testimony about his conduct while taking Plaintiff's written confession (*see* Dkt. 177-4 at 13-15) misses the

point.  As discussed above, the jury was free to disbelieve all or part of that testimony.

Further, it is entirely plausible that, having successfully employed psychological coercion

during the 40 minutes when he was alone with Plaintiff (an individual with a limited

education, little understanding of the English language, and a fragile mental state),

Defendant had no need to continue to do so in front of Officer Torres or Sergeant James

Lonergan (the other witness to Defendant's post-interview conduct).  While the jury

certainly was not compelled to reach that conclusion, it was permitted to do so.

Defense counsel also contended at oral argument that Defendant's version of events

was corroborated by the facts that Plaintiff pled guilty in his state court criminal

proceedings and reiterated his guilt years later before a federal grand jury.   However, this

argument again fails to consider the evidence in the light most favorable to Plaintiff.  As to

the former point, the evidence at trial was that Plaintiff attempted to withdraw his guilty

plea and that the state court judge denied that request.  (Dkt. 175 at 6).  As to the latter

point, Plaintiff explained at trial that when he testified before the federal grand jury, he was

afraid that he would be prosecuted federally if he claimed not to have committed the

murders.  (*Id*. at 66-67).  The jury was within its rights to credit this explanation.

In sum, the Court finds no basis to grant Defendant judgment as a matter of law on

Plaintiff's claim that Defendant violated his right against self-incrimination.

4.     <u>Punitive Damages</u>

Defendant contends that he is entitled to judgment as a matter of law on Plaintiff's claim for punitive damages, because there was nothing shocking or offensive about his conduct, nor was there any evidence that he had an evil motive or intent or was acting based on personal animus.  (Dkt. 177-4 at 23-24).  The Court disagrees that a reasonable jury could not have awarded punitive damages in this case.

"Punitive damages are available in a § 1983 action when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Lee v. Edwards,* 101 F.3d 805, 808 (2d Cir. 1996) (quoting *Smith v. Wade,* 461 U.S. 30, 56 (1983)).  As detailed above, the jury in this case could have reasonably concluded that Defendant caused the fabrication of a false confession and then caused that false confession to be used to prosecute Plaintiff. Such actions easily satisfy the standard for engaging in callous indifference to Plaintiff's constitutional rights.  Further, a reasonable jury could determine that such conduct was shocking, offensive, and sufficiently egregious to warrant an award of punitive damages. *See, e.g., Niemann v. Whalen*, 928 F. Supp. 296, 300 (S.D.N.Y. 1996) (finding jury was warranted in awarding punitive damages where defendant coerced a false confession), *aff'd,* 107 F.3d 3 (2d Cir. 1997).

For all these reasons, the Court denies in its entirety Defendant's motion for judgment as a matter of law.

- 16 -

**B.**     **Motion for a New Trial**

Defendant seeks in the alternative a new trial pursuant to Rule 59(a).  "As a general matter, a motion for a new trial should be granted when, in the opinion of the district court, the jury has reached a seriously erroneous result or the verdict is a miscarriage of justice." *DLC Mgmt. Corp. v. Town of Hyde Park*, 163 F.3d 124, 133 (2d Cir. 1998) (quotation and alterations omitted); *see also Farrior v. Waterford Bd. of Educ.*, 277 F.3d 633, 635 (2d Cir. 2002) ("[A] decision is against the weight of the evidence, for purposes of a Rule 59 motion, if and only if the verdict is seriously erroneous or a miscarriage of justice[.]"). "Rule 59(a) . . . has a less stringent standard than Rule 50 in two significant respects: (1) a new trial under Rule 59(a) may be granted even if there is substantial evidence supporting the jury's verdict, and (2) a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner."  *Manley v. AmBase Corp.*, 337 F.3d 237, 244-45 (2d Cir. 2003) (quotations and citation omitted).  "The legal standard for granting a new trial under Rule 59(a) calls for deference to jury determinations while affording discretion to the trial judge to order a new trial in the event of manifest injustice." *Top Ridge Invs., LLC v. Anichini, Inc.*, No. 5:16-CV-76, 2018 WL 11419657, at *1 (D. Vt. May 7, 2018).  Whether to grant a new trial under Rule 59(a) is entrusted to the Court's discretion.  *See Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 261 (2d Cir. 2002) ("This court reviews the grant of a new trial on the ground that the verdict was against the weight of the evidence for abuse of discretion.").

- 17 -

The Court does not find that this is a case in which the jury's verdict was seriously erroneous or a miscarriage of justice. The resolution of this case turned largely on the jury's assessment of Defendant's credibility, and Second Circuit precedent "teach[es] . . . the high degree of deference accorded to the jury's evaluation of witness credibility, and that jury verdicts should be disturbed with great infrequency." *Raedle v. Credit Agricole Indosuez*, 670 F.3d 411, 418 (2d Cir. 2012). Indeed, "where, as here, a verdict is predicated almost entirely on the jury's assessments of credibility, such a verdict generally should not be disturbed except in an egregious case[.]" *Id.* at 418-19 (reversing district court's grant of new trial where "[i]n the final analysis, the only testimony regarding what was actually said came from [one witness], and thus the entire case hinged on his credibility").

Here, the jury plainly concluded that Defendant was not being truthful about his interactions with Plaintiff, and there was support in the record for that conclusion. For example, Defendant changed his testimony in some respects from his deposition testimony. (*See, e.g.,* Dkt. 165 at 45-47). Perhaps most significantly, Defendant initially testified at trial that he did not have a conversation with Plaintiff during the 40 minutes they were alone. (*Id.* at 39). However, the jury subsequently learned that Defendant had testified at his deposition that he and Plaintiff had engaged in conversation during that time period, including conversation about the murders, and that Defendant had created two pages of notes during that time containing information specific to the crimes at issue. (*Id.* at 40-44). After being confronted with his prior testimony, Defendant tried to claim that he had asked

"[j]ust limited" questions of Plaintiff, but conceded on further cross-examination that he had asked Plaintiff "questions and details about how the crime had been committed" before a translator arrived and before Plaintiff was advised of his Fifth Amendment rights, and that it was during that same time frame that Plaintiff supposedly gave the facts that "led [Defendant] to believe he was the perpetrator of the crime[]."  (*Id*. at 41-42).

The Court does not consider it seriously erroneous or a miscarriage of justice for the jury to have concluded that Defendant was not a credible witness, nor for the jury to have drawn reasonable inferences based on the circumstantial evidence as to what actually occurred during the 40 minutes that Plaintiff and Defendant were alone together prior to Plaintiff's written confession.  Under the circumstances of this case, the Court does not find it to be the rare occasion on which the jury's verdict should be disturbed.

**C.**    **Motion for Remittitur**

Defendant's final request is for remittitur pursuant to Rule 59(e).  The Second Circuit has explained that:

> The district court has authority to enter a conditional order of remittitur, compelling a plaintiff to choose between reduction of an excessive verdict and a new trial, in at least two distinct kinds of cases: (1) where the court can identify an error that caused the jury to include in the verdict a quantifiable amount that should be stricken, and (2) more generally, where the award is intrinsically excessive in the sense of being greater than the amount a reasonable jury could have awarded, although the surplus cannot be ascribed to a particular, quantifiable error.

*Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 165 (2d Cir. 1998) (quotations and alterations omitted).  In the latter case—where there is no particular discernable error—"generally . . .

- 19 -

a jury's damage award may not be set aside as excessive unless the award is so high as to shock the judicial conscience and constitute a denial of justice[.]" *Id.* (quotation omitted; *see also Newton v. City of New York*, 171 F. Supp. 3d 156, 171 (S.D.N.Y. 2016) ("[T]his Court must evaluate whether [the plaintiff's] Section 1983 award shocks the judicial conscience given that there is no particular discernable error that caused the jury to include in the verdict a quantifiable amount that should be stricken." (quotations and original alterations omitted)).

Defendant contends that the jury's award of $5 million in compensatory damages was intrinsically excessive. (Dkt. 177-4 at 26). The Court disagrees. As Defendant concedes, "there have been cases holding that an award of $1,000,000 . . . per year spent in prison is a reasonable award in wrongful conviction cases." (Dkt. 177-4 at 27); *see, e.g., Newton*, 171 F. Supp. 3d at 172-75 (collecting cases). Here, Plaintiff spent 10 years in prison for a crime he did not commit, and so the $5 million award equates to $500,000 per year of wrongful confinement. This is well within a permissible range.

Defendant argues that Plaintiff did not present "detailed evidence" of his emotional distress. (Dkt. 177-4 at 27). However, Plaintiff testified at trial about experiencing humiliating strip searches while imprisoned, about being attacked by other inmates, and about being assaulted by corrections officers. (Dkt. 175 at 9-14). He further expressly told the jury how difficult he found it to live in a cell, particularly in light of his mental health struggles. (*Id.* at 15). He also discussed feeling as though he constantly had to "watch[]

his back." (*Id*. at 16).  The jury could have reasonably concluded from this testimony that Plaintiff suffered significant emotional distress as a result of his wrongful conviction.

Defendant also argues that there was no "concrete evidence of a police officer's bad faith misconduct" in this case.  (Dkt. 177-4 at 27).  Of course, for the reasons discussed above, the Court disagrees with Defendant's assessment of the proof at trial that supported the jury's verdict.   While circumstantial, a reasonable jury had a legally sufficient evidentiary basis to find in favor of Plaintiff.   Moreover, the amount of compensatory damages does not depend on the presence of direct—as opposed to circumstantial—proof at trial.  So long as the proof was sufficient to support a verdict in Plaintiff's favor, which the Court has determined it was in this case, the jury was entitled to determine the amount that would compensate Plaintiff for his damages.

As to the punitive damages amount, "no objective standard exists that justifies the award of one amount, as opposed to another, to punish a tortfeasor appropriately for his misconduct." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 209 (2d Cir. 2014) (citation and alteration omitted).  However, there are three general "guideposts" a court may look to in reviewing whether a punitive damages award is excessive: "(1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the actual harm inflicted, and (3) 'the difference between this remedy and the civil penalties authorized or imposed in comparable cases.'"  *Id*. (quoting *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)).

Defendant focuses solely on the first of these guideposts in seeking remittitur, arguing that "there was no evidence of reprehensible conduct by" Defendant. (Dkt. 177-4 at 27). For the reasons discussed at length above, the Court disagrees. The jury reasonably found that Defendant, a law enforcement officer, fabricated a false confession, and thereby caused an innocent man to be imprisoned for 10 years. That is reprehensible conduct as that term is used in this context. *See Stampf*, 761 F.3d at 209 (explaining that "[c]onduct that involves deceit or malice is more reprehensible than conduct involving mere negligence" and "conduct that could cause serious physical or emotional injury is more reprehensible than conduct that risks only minor injuries or economic damages"). Defendant's argument relies on his contention that he did nothing more than take a statement from Plaintiff (Dkt. 177-4 at 27), but that is not what the jury found.

The Court further notes that the ratio of punitive damages to compensatory damages in this case is 1.5:5, which is less than the 1:1 ratio that the Second Circuit has said does not "raise a suspicious judicial eyebrow." *Stampf*, 761 F.3d at 211 (quoting *Gore*, 517 U.S. at 582). Further, at least one other federal court has apparently approved an "award of $13,000,000 in punitive damages for 31 years of incarceration based on [a] false confession." *Burton v. City of New York*, No. 20-CV-9025 ATR WL, 2022 WL 9491955, at *14 (S.D.N.Y. Sept. 26, 2022) (citing *McCollum v. Robeson County*, No. 15-CV-00451, Dkt. No. 429 (E.D.N.C. May 14, 2021)).

In sum, Defendant has failed to persuade the Court that either the compensatory damages award or the punitive damages award in this case is greater than the amount a reasonable jury could have awarded.  Accordingly, the Court denies Defendant's request for remittitur.

## II.   Plaintiff's Motion for Attorneys' Fees

The Court turns next to Plaintiff's motion for attorneys' fees.  Pursuant to 42 U.S.C. § 1988, the Court may award the prevailing party in a § 1983 action a reasonable attorneys' fee.  *See Lilly v. City of New York*, 934 F.3d 222, 227 (2d Cir. 2019).  In determining what constitutes a reasonable fee, the Court must "calculate a presumptively reasonable fee by determining the appropriate billable hours expended and setting a reasonable hourly rate, taking account of all case-specific variables."  *Id*. at 229-30 (quotations omitted).  This constitutes the "lodestar figure," which "has, as its name suggests, become the guiding light of [federal] fee-shifting jurisprudence."  *Perdue v. Kenny A*., 559 U.S. 542, 551 (2010) (quotation omitted).

A reasonable hourly rate "is the rate a paying client would be willing to pay."  *Id*. (quoting *Arbor Hill Concerned Citizens Neighborhood Assoc. v. County of Albany*, 522 F.3d 182, 190 (2d Cir. 2008)).  "In determining what rate a paying client would be willing to pay, the district court should consider, among others, the *Johnson*[3] factors; it should also

---

[3]     *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974).  The twelve *Johnson* factors are: "(1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's

bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively." *Id.* "The determination of an award of attorney's fees under 42 U.S.C. § 1988 is committed to the sound discretion of the district court because the appropriate amount is dependent on the unique facts of each case." *Raja v. Burns*, 43 F.4th 80, 86 (2d Cir. 2022) (quotation omitted).

"The burden is on the party seeking attorney's fees to submit sufficient evidence to support the hours worked and the rates claimed." *Torcivia v. Suffolk Cnty.*, 437 F. Supp. 3d 239, 251 (E.D.N.Y. 2020). Here, Plaintiff seeks $538,032.50 in attorneys' fees and $37,638.28 in costs. (Dkt. 167-1 at ¶¶ 6-7). Plaintiff is a prevailing party in this case, and so the Court concludes that a fee award is appropriate. However, for the reasons set forth below, the Court will award $123,550.00 in attorneys' fees and $2,474.81 in costs, rather than the amounts requested by Plaintiff.

A.    **Hours Expended**

1.    **Fees Incurred in Other Matters**

Turning first to the determination of the appropriate billable hours expended, Plaintiff seeks compensation for 1065.4 hours expended by Wayne Felle, Esq., 150.8 hours expended by Edward Markarian, Esq., 24 hours expended by Elizabeth Bruce, Esq., and

---

customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the 'undesirability' of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases." *Arbor Hill*, 522 F.3d at 186 n.3.

190.7 hours expended by paralegal Briana Croce. (Dkt. 167-1 at ¶ 6). However, as Defendant correctly points out, Plaintiff has included in this request many hundreds of hours of time spent on other proceedings and legal matters to which Defendant was not a party. This includes: proceedings in *Ortiz v. Case*, No. 1:16-cv-00322, a civil case in this District which was resolved in favor of the defendants; proceedings in the New York Court of Claims; proceedings in *United States of America v. Ortiz*, No. 1:16-cr-00077, a criminal case in this District wherein Plaintiff was convicted of being a felon in possession of a firearm; and Social Security, disability, and Medicare proceedings.

As the Second Circuit has recently explained, "[i]n section 1988, Congress authorized district courts only to allow the prevailing party a reasonable attorney's fee in an action or proceeding to enforce section 1983." *Raja*, 43 F.4th at 92 (quotation and alteration omitted). Fees incurred in connection with related proceedings may generally be recovered only to the extent those proceedings were "useful and of a type ordinarily necessary to advance the civil rights litigation." *Id.* (quotation omitted).

Here, the Court largely agrees with Defendant that this standard has not been satisfied with respect to the other proceedings as to which Plaintiff seeks attorneys' fees, inasmuch as the other legal proceedings at issue were not sufficiently related to this action. The exception is fees related to Plaintiff's "initial Section 440 proceeding to vacate his conviction." (Dkt. 179 at ¶ 12). Plaintiff could not pursue the instant action without first having his conviction vacated, or his claims would have been barred by *Heck v. Humphrey*,

- 25 -

512 U.S. 477 (1994).  Accordingly, the state court proceeding to vacate his criminal conviction was both useful and necessary to advance the instant § 1983 action.

Defendant relies on an unreported, out-of-Circuit case to support his argument that fees related to the § 440 proceeding are not recoverable under § 1988.  (*See* Dkt. 179-1 at 14-15 (citing *DeLew v. Nevada*, No. 2:00-CV-00460-LRL, 2010 WL 11636127 (D. Nev. Jan. 7, 2010))).  However, the *DeLew* case is not on point, as it involved fees related to a wrongful death suit, not fees related to seeking the vacatur of a criminal conviction.  *See* 2010 WL 11636127, at *6.  Further, the *DeLew* court acknowledged that "attorney's fees may be available 'where a state proceeding is a necessary preliminary action to the enforcement of a federal claim[.]'"  *Id*. (quoting *Simi Inv. Co. v. Harris County*, 236 F.3d 240, 255 (5th Cir. 2000)).  Again, Plaintiff could not have pursued his § 1983 claims without first having his conviction vacated in state court.

Defendant has identified 438.7 hours of legal fees that he claims should be struck as having been incurred in connection with miscellaneous other legal proceedings.  (Dkt. 179 at ¶ 13).  The Court has reviewed the entries identified by Defendant and notes that the entries from April 11, 2014, to January 15, 2015, are related to the § 440 proceedings in which Plaintiff's conviction was vacated.  These entries total 57.3 hours.  The Court agrees with Defendant that most of the remaining 381.4 hours are not recoverable.  However, the entry on September 21, 2021, for 1.8 hours appears on its face to be related to this matter,

as does the entry on May 9, 2022, for 13 hours.  The Court has not excluded these two entries on this basis.

Defendant has further identified 465.9 hours in fees that he asserts are associated with the actions before the New York Court of Claims and Appellate Division, Fourth Department and 47.7 hours that are associated with the *Ortiz v. Case* matter.  (Dkt. 179 at ¶¶ 14-15).[4]  The Court has reviewed the entries identified by Defendant and agrees that they are not recoverable.  The Court also agrees with Defendant that time spent on public relations events should be struck, and has not included the identified public relations entries in its lodestar calculation.  (*See id.* at ¶ 16).

The Court was not persuaded by Plaintiff's counsel's contention at oral argument that certain of the hours expended in connection with the other litigation discussed above were meant to overlap with and also be used in connection with this litigation.  Plaintiff's counsel was unable to point to any record support for that contention, and as the party seeking fees, it is Plaintiff's burden to "submit sufficient evidence to support the hours worked[.]"  *Torcivia*, 437 F. Supp. 3d at 251.  Without some kind of evidentiary support (and absent any identification of the specific hours at issue), an attorney's general assertion does not satisfy this standard.

---

[4]     There is some overlap in the entries identified in paragraphs 13, 14, 15, and 16 of Defendant's declaration.  The Court has accordingly independently cross-referenced the identified entries with Plaintiff's counsel's billing ledger, and has performed its own calculation of the hours remaining for each timekeeper when the entries described in this Decision and Order are excluded.

### 2.    <u>Vague Entries</u>

Defendant next argues that the Court should strike 11 billing entries for "client meeting" or "meeting with client" as impermissibly vague. (*Id*. at ¶ 17).  The Court agrees. "Courts may deny compensation where the billing information submitted is too vague to sufficiently document the hours claimed."  *Decastro v. City of New York*, No. 16-CV-3850 (RA), 2017 WL 4386372, at *8 (S.D.N.Y. Sept. 30, 2017) (quotation omitted).   In the context of this case, where counsel was representing Plaintiff in connection with multiple actions, the phrases "client meeting" and "meeting with client" provide no useful information about the work done.  The Court accordingly will not include these entries in its calculation.  *See Broker Genius Inc. v. Seat Scouts LLC*, No. 17-CV-8627 (SHS), 2019 WL 3773856, at *3 (S.D.N.Y. Aug. 12, 2019) (describing "[c]alls with team and team meeting, call with client and review of additional documentation" as "exactly the type of descriptions that courts have found to be impermissibly vague in the context of recovering attorneys' fees").

### 3.    <u>Unnecessary Pre-trial Motion Practice</u>

Defendant further asks the Court not to award fees associated with pre-trial motion practice regarding Plaintiff's failure to disclose expert witnesses, Plaintiff's request for an adjournment of the trial date, and the termination of Hancock and withdrawal of Mr. Pierce. (*See* Dkt. 179 at ¶¶ 18-21).   Defendant contends that these activities were unnecessary and

incurred because of Plaintiff's counsel's own failure to comply with the Federal Rules of Civil Procedure.  (Dkt. 179-1 at 19).

"In determining the number of hours reasonably expended on a case, a district court properly excludes documented hours that are excessive, redundant, or otherwise unnecessary." *Raja*, 43 F.4th at 87 (quotation omitted).  Here, the Court does not agree that the motion practice regarding expert witnesses falls within that category.  While the Court ultimately largely found in Defendant's favor on those motions, the Court cannot say that the associated motion practice was unnecessary.

However, the Court agrees that Defendant should not have to bear the costs of Plaintiff's request for an adjournment of the trial date, which was entirely without basis and which the Court noted was made in an attempt at gamesmanship.  (*See* Dkt. 138). Defendant also should not have to bear the costs of the internal dispute between Plaintiff's lawyers, which could and should have been handled without resort to motion practice.

Plaintiff's counsel has included litigation of the motion for an adjournment and his work related to his dispute with Mr. Pierce in large, blocked-billed entries in April of 2022. The Court accordingly strikes from the requested fees a 12.5-hour entry on April 14, 2022, a 7.5-hour entry on April 19, 2022, a 6.8-hour entry on April 20, 2022, a 7.2-hour entry on April 21, 2022, and an 8.6-hour entry on April 26, 2022, each of which references work on these items.  (*See* Dkt. 167-2 at 19).

### 4.   __Paralegal Time Charged to Attorney__

Defendant has identified three specific occasions on which Mr. Felle appears to have billed hours that were actually worked by his paralegal, Ms. Croce. The first is an entry on June 3, 2019. (Dkt. 167-2 at 12). The time entry says: "Sent co-counsel transcripts and exhibits (WCF 1.5) (BEC 2)." (*Id*.). However, the corresponding hours charge 3.5 hours to Mr. Felle and none to Ms. Croce. This is clearly an error, as the time entry itself allocates 2 hours of work to Ms. Croce. Similar errors can be seen in an entry from November 8, 2019, attributing 0.3 hours of Ms. Croce's work to Mr. Felle, and in an entry from April 29, 2022, attributing 6.5 hours of Ms. Croce's work to Mr. Felle. (*Id*. at 12, 20). The entry from November 8, 2019, has already been disallowed by the Court as related to state court litigation. For the remaining misallocated 8.5 hours, the Court will apply Ms. Croce's rate and not Mr. Felle's rate.

### 5.   __Block Billing and Other Deficient Time-Keeping Practices__

In addition to the specific arguments made above, Defendant seeks an across-the-board reduction in the requested hours, arguing that counsel's "time entries demonstrate widespread block-billing, excessively vague time-entries, and are suggestive of either deliberate overestimation or a failure to maintain contemporaneous records." (Dkt. 179-1 at 16). Defendant specifically seeks an across-the-board 75% reduction in the remaining hours. (*Id*. at 17).

"Block billing—. . . the practice of lumping multiple distinct tasks into a single billing entry—is generally disfavored because it can complicate the district court's task of determining the reasonableness of the billed hours." *Raja*, 43 F.4th at 87.  Nonetheless, "the practice is by no means prohibited in this Circuit because block billing will not always result in inadequate documentation of an attorney's hours." *Id*.  In particular, block billing is "permissible as long as the district court is still able to conduct a meaningful review of the hours for which counsel seeks reimbursement." *Id*. (quotation omitted)  Here, while Plaintiff's counsel did engage in block billing, the Court does not find that the practice was so egregious as to prevent meaningful review of the requested hours.

However, the Court does agree that some reduction is appropriate due to the vagueness of the time entries and because they reflect excessive time spent on routine matters. *See Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998).  To give just a few example of excessive time spent on routine matters, an entry on April 25, 2016, reflects two hours of attorney time for "filed, paid—claims against City and County"; an entry on November 2, 2016, reflects 0.5 hours of attorney time for "[s]ent correspondence to defense attorneys with discovery responses and demands"; an entry on June 3, 2019, reflects 3.5 hours being spent simply to send transcripts and exhibits to co-counsel; an entry on September 9, 2020, reflects 0.4 hours being spent to fax a request for records; and an entry on March 2, 2021, reflects 0.7 hours being spent to "[e]mail page count for draft record." (Dkt. 167-2).  For examples of vague entries (and in addition to the "client meeting" and

"meeting with client" entries already discussed), an entry on March 16, 2016, states, "[p]hone call with client"; an entry on May 1, 2017, states "[p]hone call with client"; an entry on August 8, 2017, states "[e]mail to co-counsel"; an entry on October 15, 2018, states "ltr to AP, t/c w/ client"; an entry on February 24, 2021, states, "[m]essage to counsel"; an entry on April 21, 2021, states "[p]hone call with counsel; discussed next steps"; an entry on April 30, 2021, states "[p]hone call with counsel; email with counsel"; and an entry on November 10, 2021, states "[l]etter to Fed. Ct., t/c AP." (*Id*.). These lists are not exhaustive, but are representative of counsel's timekeeping practices.

"To address such redundancy or vagueness, 'the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application.'" *Raja*, 43 F.4th at 87 (quoting *Kirsch*, 148 F.3d at 173). Here, the Court finds an across-the-board reduction of 15% sufficient to account for these time-keeping deficiencies. *See Mason Tenders Dist. Council Welfare Fund v. Gibraltar Contracting, Inc*., No. 1:18-CV-3668-MKV, 2020 WL 6363960, at *2 (S.D.N.Y. Oct. 29, 2020) (applying 20% reduction to account for similar issues and collecting cases applying reductions between 15% and 30%).

Taking all these rulings together, the Court finds that, prior to any across-the-board reduction, the reasonable hours spent on this litigation are as follows: 449 hours by Mr. Felle, 2.1 hours by Mr. Markarian, 23.2 hours by Ms. Bruce, and 55.8 hours by Ms. Croce.

Applying the 15% across-the-board reductions results in a total of 381.7 hours by Mr. Felle, 1.8 hours by Mr. Markarian, 19.7 hours by Ms. Bruce, and 47.4 hours by Ms. Croce.

## B.    Reasonable Hourly Rates

Plaintiff seeks the following hourly rates: $425 per hour for Mr. Felle; $335 per hour for Mr. Markarian; $325 per hour for Ms. Bruce; and $125 per hour for Ms. Croce. (Dkt. 167-1 at ¶ 6).  Defendant maintains that these rates are unreasonably high.  (Dkt. 170-1 at 23-24).  The Court agrees.

For purposes of calculating the lodestar figure, the Court applies "the prevailing hourly rate in the community," and "the community for purposes of this calculation is the district where the district court sits." *Arbor Hill*, 522 F.3d at 190 (quotations and alteration omitted).  The Court may use an out-of-District hourly rate only "if it is clear that a reasonable, paying client would have paid those higher rates." *Id*. at 191.  There is a presumption that "a reasonable, paying client would in most cases hire counsel from within his district, or at least counsel whose rates are consistent with those charged locally," and the burden is on the attorney seeking a higher rate to rebut that presumption. *Id*.

In the Western District of New York, the prevailing hourly rate for an experienced attorney in a civil rights matter is typically no more than $300 per hour, while less experienced attorneys typically have rates of no more $200 per hour. *See Warr v. Liberatore*, No. 13-CV-6508MWP, 2022 WL 969528, at *5 (W.D.N.Y. Mar. 31, 2022) (collecting cases and finding, in civil rights action, that $350 per hour rate for experienced

- 33 -

attorney was unreasonable and should be reduced to $295 per hour).  The rates proposed by Plaintiff's counsel are far outside this range, and the Court finds no reason to apply out-of-District rates in this case.

The Court has considered the *Johnson* factors, among others, in making this determination.  As a threshold matter, the Court notes that Defendant contends that the Supreme Court's decision in *Perdue* "specifically rejected the use of the *Johnson* factors for § 1988 motions" and that *Arbor Hill* is "no longer good law" regarding calculation of a reasonable hourly rate.  (Dkt. 179-1 at 22-23).  However, the Second Circuit held to the contrary in *Lilly*, explaining that "*Perdue* . . . did not overrule *Arbor Hill* or otherwise prohibit district courts from considering the novelty or complexity of a case in determining the reasonable hourly rate or hours billed," and that "the twelve *Johnson* factors remain important tools for helping district courts calculate the lodestar and, in exceptional cases, determining whether an enhancement or cut to the lodestar is warranted."  934 F.3d at 232-33.  Accordingly, the Court rejects Defendant's invitation to ignore the *Johnson* factors.

As set forth above, the *Johnson* factors are (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the

attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. The Court has considered these factors and does not find that they support the imposition of a higher hourly rate in this case.

Plaintiff's arguments to the contrary are not persuasive. While counsel certainly expended significant time and labor, much of that time and labor (as set forth above) was spent on other legal proceedings. Plaintiff concedes that "this matter did not present significant novel legal questions." (Dkt. 167-3 at 13). The Court further does not find that this case required any unusual skill to pursue.

Counsel contends that he was unable to take on certain other paying matters "during the most intense periods of litigating this case[.]" (*Id*. at 14). While this may be true, those "intense periods" of litigation were relatively limited, and not out of the ordinary for a civil rights matter.

Counsel also contends that his customary hourly rate significantly exceeds the rates sought in the instant fee application. (*Id*. at 15). However, he has calculated his "hourly rate" by looking to contingent fee cases, which the Court does not find to be a useful comparison. The effective hourly rate in a contingent fee case is recompense for the risk of not being paid at all, and is not reflective of the hourly rate a paying client would agree to in a traditional attorney-client relationship. The Court further does not find the fact that

counsel will receive a contingent fee from Plaintiff a reason to depart from the prevailing hourly rates in this District.

Counsel's argument that he was "tasked with conducting discovery and preparing for trial within an expedited timeframe" (Dkt. 167-4 at 15) is entirely belied by the history of this case. Discovery in this matter began in 2016 and did not close until 2020. (*See* Dkt. 68). Further, the Court resolved all dispositive motions by February 2021 (*see* Dkt. 82), and the trial did not occur until over a year later, in May of 2022. The Pretrial Order setting filing deadlines was entered in December of 2021, approximately five months before the trial occurred. (*See* Dkt. 98). This is not an expedited timeframe.

Counsel did obtain a significant award on behalf of his client. However, as discussed further below, there were also many unsuccessful claims brought in this action. Accordingly, the Court does not find that this factor warrants an upward adjustment in the hourly rate. The Court is further unpersuaded by counsel's arguments regarding his experience, inasmuch as counsel has previously represented to the Court that he is unexperienced in federal court matters such as this one.

Plaintiff's counsel argues that the case was "undesirable" because it is societally unpopular to sue law enforcement. (Dkt. 167-4 at 17-18). However, Plaintiff—who spent 10 years in jail for a crime he concededly did not commit—was a sympathetic litigant, and the potential damages were very high. The Court is not persuaded that this case was

undesirable on the whole.  The Court also does not find this case out of the ordinary with respect to the nature of the professional relationship between counsel and client.

Finally, counsel has not cited any civil rights cases in this District where hourly rates in line with those sought here were awarded.  He has instead relied on cases from the Southern and Eastern Districts of New York, where the prevailing rates are significantly higher than in the Western District of New York.  Indeed, in one of the cases that Plaintiff cites, *Vilkhu v. City of New York*, No. 06-CV-2095 CPS (JO), 2009 WL 1851019 (E.D.N.Y. June 26, 2009), the Second Circuit vacated and remanded the decision specifically because the district court had applied Southern District prevailing rates, and not rates from the Eastern District.  *See Vilkhu v. City of New York*, 372 F. App'x 222, 224 (2d Cir. 2010).

The Court accordingly finds that the reasonable hourly rates in this case should be in line with the prevailing rates in this District.  Specifically, the Court finds that rates of $300 per hour for Mr. Felle, $200 per hour for his associates, and $100 per hour for his paralegal are what a reasonable paying client would have been willing to pay.  Multiplying these rates by the hours previously calculated by the Court results in a lodestar figure of $123,550.00.

## C.    <u>Unsuccessful Claims</u>

Defendant asks the Court to reduce the fee award based on the fact that several claims and defendants were dismissed from this case prior to trial.  (Dkt. 179-1 at 21).  "[P]laintiffs may receive fees under § 1988 even if they are not victorious on every claim.

A civil rights plaintiff who obtains meaningful relief has corrected a violation of federal law and, in so doing, has vindicated Congress's statutory purposes." *Fox v. Vice*, 563 U.S. 826, 834 (2011).  Where "the plaintiff's claims involve a common core of facts or are based on related legal theories, and are therefore not severable, attorney's fees may be awarded for unsuccessful claims as well as successful ones." *Green v. Torres*, 361 F.3d 96, 98 (2d Cir. 2004) (quotations and alterations omitted).   Nevertheless, "[a]lthough full fees may be awarded to a partially prevailing plaintiff when the underlying claims are intertwined, the court retains substantial discretion to take into account the specific procedural history and facts of each case." *Id*.

Here, the Court is not persuaded that a further reduction is warranted on this basis. In particular, in exercising its discretion, the Court must "focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation," and "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation[.]" *Hensley v. Eckerhart,* 461 U.S. 424, 435 (1983).  Here, there is no question that Plaintiff obtained a very significant award in his favor, and he was fully successful on all the claims that proceeded to trial.  The Court does not find that this is a case in which the lodestar figure should be reduced based on the presence of unsuccessful but intertwined claims.

- 38 -

D.     **Costs**

The Court turns to Plaintiff's request for costs.  "The Second Circuit has held for a prevailing plaintiff, attorney's fees awards include those reasonable out-of-pocket expenses incurred by attorneys and ordinarily charged to their clients."  *Torcivia*, 437 F. Supp. 3d at 257 (quotation omitted).  In this case, Plaintiff seeks $37,638.00 in costs.  (Dkt. 167-1 at ¶ 7).  However, as Defendant has correctly noted, Plaintiff's fee request includes $27,899.50 for expert witness fees.  (*See* Dkt. 179 at ¶ 5).  "Section 1988 does not convey the authority to shift experts' fees to the losing party" in § 1983 cases.  *Stratakos v. Nassau Cnty.*, 574 F. Supp. 3d 154, 162 (E.D.N.Y. 2021) (quotation omitted); *see also Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 297 (2006) ("'[C]osts' is a term of art that generally does not include expert fees." (citation omitted)).  Further, all four of the expert witnesses in question were precluded from testifying by the Court due to counsel's failures to comply with the Federal Rules of Civil Procedure, and the Court would not award their fees even if it had the authority to do so.

Additionally, and again as Defendant correctly points out (*see* Dkt. 179 at ¶ 8), the majority of the remaining costs sought by Plaintiff were incurred in connection with other actions.  For example, Plaintiff seeks reimbursement of his filing fee in the New York State Court of Claims, as well as service fees and transcripts associated with his state court proceedings and his federal criminal proceedings.  (*See* Dkt. 167-3).

Having reviewed the documentation presented by Plaintiff, the Court finds he is entitled to reimbursement of: $400 in filing fees; $100 in service fees; $808.10 in transcript fees; and $1,166.71 in printing fees.  This is a total of $2,474.81, which is awarded to Plaintiff as costs.

## III.   Hancock's Motion for Attorneys' Fees

The Court turns finally to Hancock's motion for attorneys' fees.  Hancock seeks fees pursuant to § 1988.  (Dkt. 169-1 at ¶ 2).  In the alternative, Hancock asks to intervene in this matter and for the Court to confirm that it has a charging lien that is enforceable against either Plaintiff or Mr. Felle.  (*See* Dkt. 169-2 at 15).

### A.   Request under § 1988

Under § 1988, "it is the prevailing party rather than the lawyer who is entitled to attorney's fees."  *Brown v. Gen. Motors Corp., Chevrolet Div.*, 722 F.2d 1009, 1011 (2d Cir. 1983).  Accordingly, a claim for attorneys' fees under § 1988 "must itself be made by the party rather than the attorney."  *Id.*; *see also Valley Disposal Inc. v. Cent. Vermont Solid Waste Mgmt. Dist.*, 113 F.3d 357, 361 (2d Cir. 1997) ("This Court, noting § 1988's provision for fees to be awarded to the party, has interpreted § 1988 to mean that the person who is entitled to the award of attorneys' fees is the prevailing party rather than the lawyer." (quotations omitted)).  Accordingly, under § 1988, "a former attorney who withdrew as counsel lack[s] standing to claim attorney's fees from a defendant in his own name."  *Perez v. Progenics Pharms., Inc.*, 204 F. Supp. 3d 528, 552 (S.D.N.Y. 2016); *see also Babcock*

- 40 -

*v. Rezak*, No. 96-CV-0394E(SC), 2004 WL 1574623, at *1 (W.D.N.Y. June 23, 2004) (denying former attorney's request for fees under § 1988 for lack of standing).

Hancock acknowledges that "[c]ase authority provides that under section 1988 it is the party and not the party's attorney who is entitled to apply for and obtain an award of attorneys' fees and costs" (Dkt. 169-2 at 15), but suggests that *Brown* should be limited to its facts, citing *Malarkey v. Texaco, Inc*., 794 F. Supp. 1237 (S.D.N.Y. 1992). However, *Malarkey* did not discuss *Brown* or consider the issue of standing. Further, there is nothing in the *Malarkey* case suggesting that the plaintiff had not joined in the request for fees by her former counsel. By contrast, the record in this case reflects that Plaintiff deliberately did not include Hancock's fees and costs in his § 1988 application. (*See* Dkt. 170-3).

Under the circumstances of this case, Hancock lacks standing to seek attorneys' fees from Defendant under § 1988. The right to do so belongs to Plaintiff, who has chosen to exercise it solely with respect to fees and costs incurred by Mr. Felle and his associates and paralegal. Indeed, Mr. Pierce seemed to concede at oral argument that Hancock's request for fees under § 1988 was contingent upon Plaintiff having joined therein, which he has not done. Accordingly, Hancock's request for fees under § 1988 is denied.

## B.    Requests to Intervene and for a Charging Lien

The Court turns to Hancock's alternative requests to intervene and for a charging lien. As an initial matter, the Court notes that it has jurisdiction over Hancock's alternative requests. "Federal courts may exercise supplemental jurisdiction to hear fee disputes

between litigants and their attorneys when the dispute relates to the main action." *Alderman v. Pan Am World Airways*, 169 F.3d 99, 102 (2d Cir. 1999) (quotation omitted).  The Second Circuit has "held, in an unbroken line of cases, that a fee dispute between a party and its attorneys shares a common nucleus of operative fact with the underlying action." *Shukla v. Sharma*, 586 F. App'x 752, 753-54 (2d Cir. 2014) (quotation omitted).

"A charging lien is a security interest in the favorable result of litigation, giving the attorney [an] equitable ownership interest in the client's cause of action and ensuring that the attorney can collect his fee from the fund he has created for that purpose on behalf of the client." *Charnow v. Charnow*, 134 A.D.3d 875, 876 (2d Dep't 2015) (citation omitted). "The Second Circuit has made clear that Section 475 [of the New York Judiciary Law] governs attorneys' charging liens in federal courts sitting in New York, and such liens are 'enforceable in federal courts in accordance with its interpretation by New York courts.'" *Stair v. Calhoun,* 722 F.Supp.2d 258, 267 (E.D.N.Y. 2010) (quoting *Itar-Tass Russian News Agency v. Russian Kurier, Inc.,* 140 F.3d 442, 449 (2d Cir. 1998)).

"The Second Circuit has not decided whether attorneys may intervene solely for the purpose of protecting their contractual rights to fees or to enforce a charging lien." *United States v. Salix Pharms., Ltd.*, No. 15CV706 (DLC), 2016 WL 4402044, at *3 (S.D.N.Y. Aug. 18, 2016).  Indeed, the Second Circuit has noted that "there are arguments both for and against allowing discharged attorneys to intervene to protect their legal fees" and that it is a "close question." *Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171,

176 (2d Cir. 2001); *see also Peterson v. Islamic Republic of Iran*, 690 F. App'x 744, 745-46 (2d Cir. 2017) (declining to reach issue of whether attorney's "asserted contractual interest and statutory charging lien on the proceeds from a judgment in favor of certain plaintiffs he used to represent" was "valid and sufficient to support intervention of right"). However, the Court does not find that intervention is required in order for Hancock to seek confirmation of its charging lien.   As noted above, the Second Circuit has made clear that Judiciary Law § 475 governs attorneys' charging liens in federal courts sitting in New York, and Judiciary Law § 475 empowers the Court "upon the petition of the client <u>or attorney</u>" to "determine and enforce the lien."   N.Y. Judiciary L. § 475 (emphasis added). Accordingly, in *Itar-Tass*, the Second Circuit held that former counsel may seek to enforce his lien even when permitted to withdraw as attorney of record.   140 F.3d at 451.   In other words, counsel who has "been an attorney of record" is "entitled to have . . . his charging lien determined by the district court under Section 475."   *Id*. at 452.   The Court thus denies Hancock's request for intervention as moot.

As to the request for confirmation of the charging lien, "attorneys who terminate their representation are . .  entitled to enforce their charging liens, as long as the attorney does not withdraw without 'good cause' and is not discharged for 'good cause.'"   *Stair*, 722 F. Supp. 2d at 267.   Here, while Mr. Felle apparently took the position at one time that Hancock had been discharged for cause (*see* Dkt. 170-5 at 4), Plaintiff did not file any opposition to Hancock's motion for attorneys' fees.   It is the client's burden to show a

discharge for cause in opposition to an assertion of a charging lien. *See Love & Madness, Inc. v. Claire's Holdings, LLC*, No. 21 CIV 1913 ATSLC, 2021 WL 4554058, at *4 (S.D.N.Y. Oct. 4, 2021). Plaintiff has not done so here.

As to the amount of the charging lien, "the proper method of fixing the sum of the lien is through a *quantum meruit* analysis, which requires ascertaining the reasonable value of the services rendered." *Pettiford v. City of Yonkers*, No. 14 CIV. 6271 (JCM), 2020 WL 1331918, at *3 (S.D.N.Y. Mar. 20, 2020) (quotation and alteration omitted), *aff'd*, 833 F. App'x 893 (2d Cir. 2020). Much like determining an award under § 1988, this generally involves calculating the lodestar figure, "which is the product of a reasonable hourly rate and the reasonable number of hours required by the case." *Id*. at *5 (quotation omitted).

Here, Hancock seeks $183,426.50 in fees. (*See* Dkt. 169-1 at ¶ 12). This consists of 439.3 hours expended by Mr. Pierce, 11.8 hours expended by associate Paul Tuck, 2.1 hours expended by associate Mary D'Agostino, 27.6 hours expended by associate William Hython, and 2.1 hours expended by paralegal Amy Cobb. (*Id*.). However, in reply, Hancock concedes that certain entries were included in its request that should not have been, as they related to the *Ortiz v. Case* matter or the New York Court of Claims matter. The Court has reviewed the billing records submitted by Hancock, and concludes that 22.7 hours charged by Mr. Pierce, two hours charged by Mr. Tuck, and 8.3 hours charged by Mr. Hython were on matters other than the instant case.   This brings the hours totals to 416.6 for Mr. Pierce, 9.8 hours for Mr. Tuck, and 19.3 hours for Mr. Hython.

The Court further finds that a 15% across-the-board reduction is appropriate, due to the vagueness of certain time entries and excessive time spent on certain routine matters. A few examples of vague entries include: an entry on August 3, 2017, that states "[r]eviewed documents for case"; an entry on August 21, 2017, that states "[e]mails with Attorney Felle re case"; an entry on November 21, 2017, that states "[t]elephone conference with Attorney Felle"; and an entry on March 16, 2022, that states "[p]repared pretrial filings." (Dkt. 170).   As for examples of excessive time spent on routine matters: an entry on October 18, 2017, reflects 0.2 hours spent to "[r]eceive[] ECF notices re mediation"; an entry on November 12, 2019, reflects 0.3 hours spent on an email to opposing counsel "re extending schedule"; an entry on June 4, 2020, reflects 0.3 hours for "[r]eceived and reviewed notice of improper e-filing; re-filed letter to Judge Wolford; received extension grant from Judge"; and an entry on July 6, 2021, reflects 0.2 hours for receiving and reviewing a text order requiring the filing of a status report. (*Id.*).   Applying this reduction results in a total of 354.1 hours expended by Mr. Pierce, 8.3 hours expended by Mr. Tuck, 1.8 hours expended by Ms. D'Agostino, 16.4 hours expended by Mr. Hython, and 1.8 hours expended by Ms. Cobb.

As to the requested rates, for essentially the reasons discussed above with respect to Mr. Felle and his associates and paralegals, the Court finds that a reasonable rate for Mr. Pierce is $300 per hour, a reasonable rate for Mr. Tuck is the requested $185 per hour,  a reasonable rate for Ms. D'Agostino is $200 per hour, a reasonable rate for Mr. Hython is

the requested $190 per hour, and a reasonable rate for Ms. Cobb is $100 per hour.[5]   This

amounts to fees of $111,421.50.

Hancock also seeks $2,628.13 in disbursements.   A charging lien includes costs, so

long as they are substantiated.   *See Winkfield v. Kirschenbaum & Phillips, P.C.*, No. 12

CIV. 7424 JMF, 2013 WL 371673, at *4 (S.D.N.Y. Jan. 29, 2013).   Here, Hancock has not

substantiated its requests with documentation, but has simply submitted a list of purported

disbursements with vague entries such as "travel."   (Dkt. 170-1 at 2-3).   The Court

accordingly does not include the request for costs in its calculation of the charging lien.

*See Winkfield*, 2013 WL 371673, at *4.

The Court rejects Hancock's alternative argument that it "is entitled to an award for

its fees and costs from Mr. Felle under *Cheng v. Modansky Leasing Co., Inc*., 73 N.Y.2d

454, 458 (1989)."   (Dkt. 169-2 at 20).   The provision of *Cheng* Hancock relies upon applies

when "the fee dispute is . . . between the discharged attorney and a subsequently retained

attorney."   *Crout v. Haverfield Int'l, Inc.*, 348 F. Supp. 3d 219, 229 (W.D.N.Y. 2018).

Here, there is no indication that the fee dispute is between Hancock and Mr. Felle, as

---

[5]       Hancock has cited to a few cases approving higher hourly rates for experienced partners outside the civil rights context.   (*See* Dkt. 169 at 10-11).   However, "the range of 'reasonable' attorneys' fee rates varies depending on the type of case," *Yash Raj Films (USA) Inc v. Bobby Music Co. & Sporting Goods Inc.*, No. 01 CV 8378 (JFB), 2007 WL 9706613, at *4 (E.D.N.Y. Sept. 5, 2007), and the Court has focused its analysis on the rates typically charged in this District for civil rights litigation.

opposed to Hancock and Plaintiff.  Under the circumstances of this case, Hancock is entitled to a charging lien against its former client.

**<u>CONCLUSION</u>**

For the reasons set forth above, the Court: (1) denies Defendant's motions for judgment as a matter of law, for a new trial, and for remittitur (Dkt. 177); (2) grants Plaintiff's motion for attorneys' fees pursuant to § 1988 (Dkt. 167) to the extent it awards Plaintiff $123,550.00 in attorneys' fees and $2,474.81 in costs, and otherwise denies Plaintiff's motion for attorneys' fees; and (3) grants Hancock's motion for attorneys' fees (Dkt. 169) to the extent that it confirms Hancock's charging lien against Plaintiff in the amount of $111,421.50, and otherwise denies Hancock's motion.

SO ORDERED.

ELIZABETH A. WOLFORD
Chief Judge
United States District Court

Dated: February 17, 2022
      Rochester, New York

- 47 -